COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



| | | |
|---|---|---|
| SHAWNTRELL DAWKINS, | § | No. 08-13-00012-CR |
| | § | |
| Appellant, | § | Appeal from the |
| | § | |
| v. | § | 409th District Court |
| | § | |
| THE STATE OF TEXAS, | § | of El Paso County, Texas |
| | § | |
| Appellee. | § | (TC# 20090D05205) |
| | § | |

## O P I N I O N

In three issues, Appellant Shawntrell Dawkins appeals her conviction for the murder of

Milayna Harris. We affirm.

### BACKGROUND
#### *Factual History*

In late 2007, Sherrie Harris signed a power of attorney granting Shawntrell Dawkins the

ability to act as legal guardian for Harris' two children: Milayna, a two-year-old girl, and J.H., a

four-year-old boy.[1] Harris had befriended and become close to Appellant and her husband Nakia

while the three were stationed at a United States Army post in Germany, even going so far as to

name the Dawkinses as her children's godparents. When the Army ordered Harris to return to

---

[1] Although we are not required to use initials, Harris' son is a still-living minor, therefore, we will refer to him by his initials. *See* TEX.R.APP.P. 9.10.

Germany after a stint at a military base in Kentucky, Shawntrell Dawkins and her husband, who was stationed at Fort Bliss in El Paso, Texas, offered to care for the children for several months while Harris settled in to her new assignment. The last time Harris saw her children before departing for Europe in the fall, Milayna was a normal toddler with no health problems except for some chronic ear infections. By spring, Milayna Harris was dead.

An autopsy performed by El Paso County Medical Examiner Dr. Juan Contin revealed a subarachnoid hemorrhage, a subdural hematoma, swelling of the brain, ten bruises underneath Milayna's scalp, and blood in Milayna's spinal fluid, all caused, in Dr. Contin's opinion, by blunt force trauma to the head. Dr. Contin concluded Milayna Harris died of a head injury. Dr. Contin also noted in his report that 40 percent of Milayna's body was covered with "innumerable" bruises and abrasions. When Dr. Contin removed the skin around Milayna's back, gluteal muscles, and thighs as part of the autopsy, he found a "significant, if not a tremendous amount of hemorrhage deep in the fat." After opening up her abdominal cavity via incision, Dr. Contin saw bruises on her small and large intestines that corresponded with bruises seen on the surface of her skin. The large intestine wall was filled with blood. Dr. Contin would later testify that the marks, bruising, and abrasion patterns appeared to show that Milayna was beaten with a long, narrow object, possibly a belt with a buckle. He could not accurately determine when Milayna sustained those injuries or if she sustained all those injuries at the same time; he could only say that they did not cause her death.

Police separately questioned both Appellant and her husband Nakia following Milayna's death. Both Appellant and Nakia maintained that Milayna accidentally fell down a steep set of stairs while playing with the dog. They both denied causing Milayna's death, but did admit to using corporal punishment on her.

Two videos of Nakia appear in the record and were published to the jury at Appellant's trial. In the first, Nakia is sitting in the back of a squad car, waiting to be questioned by police. Nakia calls his supervisor, and is heard making statements including "it doesn't look good for me," "she suffered a bad head injury," and "[g]oddamn, I am going to fucking jail."

In the second video taken at police headquarters, Nakia is Mirandized, waives his right to remain silent, and is interrogated by El Paso Police Department Detective Gonzalo Chavarria and another officer. Nakia told police that his wife had received legal custody of the children from Sherrie Harris and that Appellant had moved into the apartment in October. He later moved into the apartment in February, when he returned home from a deployment in Iraq. Nakia then stated that the couple disciplined Milayna using two methods: time-outs and "whoopings." Time-outs involved having Milayna stand still with her feet apart and her hands pointed up in the air for ten minutes at a time. Whoopings involved either striking her with a hand or with Milayna's own belt. Both Nakia and Appellant would use the belt to discipline Milayna, although Nakia believed he was the more "heavy-handed" person. He related that two days before Milayna's death, he had been using the belt against Milayna because she soiled herself in spite of the fact that she was already toilet-trained, and one of the blows broke the skin on Milayna's back. He stopped immediately after he realized he had been hitting her too hard. However, Nakia had whooped her again a few hours before she died because she had soiled herself again.

Nakia maintained that at least some of the bruises on Milayna's body were self-inflicted when she threw herself down during tantrums, but he admitted that many of the bruises were caused by the belt, and that he felt frustrated because he knew Milayna would do things she knew were wrong. Nakia also stated that the reason she had bruises on her hands, arms, feet, and legs was because she would try to cover herself from the belt and would move during his

3

whoopings. When asked who hit Milayna more between him and his wife, Nakia answered that it was probably "half and half." In the days before she died, the only other person Milayna had seen was the Dawkinses' family friend, Linda Rodriguez. Nakia said he and his wife would send Milayna to Linda's house as "punishment" because she did not like to go there, but that Linda had never hit Milayna or her brother, and that he and his wife were the only people who hit the children.

Nakia told police that the night Milayna died, he had taken some Nyquil and headed to bed. Milayna was in time-out, and his wife was playing on the computer. He then said that he had been in the upstairs bedroom with his wife, and she had put Milayna in a time-out in the room with them for about ten minutes. He was lying on his side, but could hear Appellant telling Milayna to keep her hands up. Once time-out was over, Milayna went outside to go play with the dog. All of a sudden, he heard a loud boom. When asked if his wife had hit the girl, Nakia said that Appellant could not have done that, because she was in the room with him when they both heard the boom. He could not say what happened because he did not see, but he speculated that Milayna could have fallen down a raised step on the top floor where the grandfather clock was, or she could have fallen backwards down the stairs, but he did not think she had fallen far. He then put her in the shower to try and revive her, and told his wife to call 911. He noticed that Milayna's breathing was shallow. Once the ambulance took her to the hospital, he got in his car and tried to follow. However, his wife did not have her cell phone with her, and he did not know which hospital they were at. As a result, he turned around, went home, and called his supervisor from work to let him know he would not be at work tomorrow.

Appellant did not testify at trial, but the State offered, and the trial court admitted, a video recording of Appellant's video statement to police into evidence. The police officer who

4

sponsored the video conceded that the recording did not include a fifteen-minute "preinterview" police conducted with Appellant. In the video, Appellant is Mirandized and also interrogated by Detective Chavarria. She admitted that the day of Milayna's death, she had whooped Milayna for not eating her food, and Nakia had whooped her for urinating on the floor. She denied that anyone had hit Milayna on Saturday, but did agree that someone had whoopped her on Friday, but she could not remember who. She explained that whooping the children involved beating them with her hand or a belt, and that while she would try to "get her on the butt," if Milayna was kicking or rolling around on the floor, then she would get hit "wherever the belt lands."

Appellant told police that the night of Milayna's death, Milayna and the dog were playing upstairs when she fell down the stairs. Appellant did not see Milayna fall, but heard the sounds, although Milayna did not yell. Nakia was asleep, so Appellant got up and went to see what happened and caught Milayna before she fell down all the steps. When asked how many stairs Milayna fell down, Appellant stated that she did not know because she was not there. Appellant assumed the fall killed Milayna because before the fall, she was fine.

### *Procedural History*

The State indicted Appellant on two counts of murder. In Count I, the State alleged that Dawkins committed capital murder by intentionally and knowingly causing Milayna's death by either striking her about the head with an unknown object, or by striking her head against an unknown objection. In Count II, the State alleged that Dawkins committed felony murder, with Milayna's death resulting from Dawkins' commission or attempted commission of felony injury to a child, either as a principal or an accomplice.[2]

### Autopsy Photographs and Medical Examiner Testimony

---

[2] The indictment also contained a third count that was severed out into a separate case.

At issue in this appeal are State's Exhibits 68 through 90,[3] twenty-three photographs depicting Milayna's body at different stages of the autopsy performed by Dr. Contin. Because the admissibility of the photographs has been challenged, we describe each photo individually and relate them to Dr. Contin's trial testimony.

SXs 68 to 83 depict Milayna's body as it was received by the medical examiner's office before Dr. Contin performed any internal examinations. Dr. Contin referenced these photographs[4] to show the jury various bruises, cuts, and abrasions depicted in the photographs.

- **Facial and Head Pictures:** SX 68 depicts Milayna's face from the right side at an oblique angle. SX 69 shows her face from the left side at an oblique angle. SX 78 is another picture of the left side of Milayna's face in profile. SX 83 is the right side of Milayna's face in profile. SX 70 is a frontal view of Milayna's face, with her head tilted downward and the focus of the photograph on her head and hairline. SX 71 is Milayna's head from another frontal perspective, but this time with her face centered.

- **Torso Pictures**: SX 72 is a picture of the front of Milayna's naked body from the shoulder to the mid-thigh, including the pubic region. The body presents with five Skintact-brand EKG stickers placed at the chest, upper abdomen, and lower abdomen. SX 82 depicts the same area of Milayna's body with the EKG stickers removed. SX 79 is a close-up of Milayna's abdomen and hips, depicting discoloration and bruising. Dr. Contin referenced this picture in his testimony to show that abrasion came from a blunt, not sharp instrument. SX 80 is a picture of Milayna's entire back, from shoulder blade to buttocks. Dr. Contin testified that the picture showed many linear injuries and abrasion.

- **Limb Pictures**: SX 73 is a picture of Milayna's legs from mid-thigh to her feet. Her knees are bandaged. The right knee has medical tubing inserted below the knee at the bandaged area. SX 75 is a close-up of the top of Milayna's right foot. SX 76 another close-up of Milayna's left foot. SX 77 depicts her left arm. SX 81 depicts the back of both legs and feet. SX 74 is a picture of Milayna's right arm.

The remaining seven photographs that Dr. Contin discussed with the jury—SXs 84 through 90—depict Milayna's body after the medical examiner performed various dissections to

---

[3] We will refer to the State's Exhibits as SX, followed by their designation number.

[4] State's Exhibit 83 was admitted into evidence, but it does not appear that Dr. Contin ever referenced it in his testimony.

detect any internal injuries. SX 84 is a picture of Milayna's lower back, gluteal area, and the back of her thighs with the skin peeled back, exposing the underlying soft tissue. Dr. Contin referenced this picture to show the presence of blood in the fat tissue, which demonstrated impact with a hand or an instrument. Dr. Contin testified that this was a significant injury, and that he only performs this type of dissection when there are significant injuries present.

SX 85 consists of two pictures from the dissection of Milayna's abdomen. The first picture depicts the torso from about shoulder level to the hips. The skin has been completely peeled back from midline, exposing the entire abdominal cavity. Much of the overlying ribcage has been removed. Visible in the picture are Milayna's heart, intestines, and other internal organs. The second picture is a close-up of her intestines. Dr. Contin asserted that these pictures showed a bruise on the midportion of the small bowel that was apparent from discoloration. He testified that the discoloration was not normal, and that it could have only resulted from impact. He further testified that this bruise was consistent with bruising he had observed externally on the surface of Milayna's abdomen. SX 86 is another two-picture exhibit in which a portion of the large intestine, still attached to the remainder of the intestinal tract, was removed and placed on a white surface next to the body. Dr. Contin testified that this picture showed Milayna's large intestine and explained that when he examined it, he found blood inside the intestinal wall. In his opinion, the only thing that could have caused that blood in the intestine wall was an injury, not a pre-existing medical condition.

SX 87 is a picture of the top of Milayna's head with the scalp peeled back and the soft tissue under the skin exposed. Milayna's face is not visible in this picture. Dr. Contin explained how he made an incision through the top-middle of Milayna's scalp, then pulled one half of the scalp backwards and one part forward to look for any injuries under the skin. Dr. Contin

7

testified that he found nine separate bruises on the top of Milayna's head. SX 88 is another picture of Milayna's head, from the back, again with scalp peeled back. Dr. Contin asserted that this picture showed a tenth bruise at the back of the head caused by blunt force, which could have been a fist, a stick, or banging the child's head against the wall.

The final exhibit Dr. Contin discussed concerned his internal examination of Milayna's head. SX 89 is an overhead view of the top of Milayna's head. The skullcap has been cracked open, unhinged from the front of the skull, and pulled backwards, exposing the brain. Dark discoloration is easily visible on the surface of the brain. Dr. Contin testified that the picture showed that blood was present inside of Milayna's head. He then explained to the jury that inside the skull, the brain is surrounded by several protective membranes. The outermost, hardest layer sitting just beneath the skull is the dura; the membrane beneath that is the arachnoid. Dr. Contin then stated that he found a subdural hematoma and subarachnoid hemorrhaging, which indicated that Milayna's blood had filled the spaces between the dura and the arachnoid, and the arachnoid and the brain. He testified that this type of bleeding is often fatal, and that he believed it was the cause of death in this case.[5]

At that point in Dr. Contin's testimony, the trial court indicated that "the Court needs to take a break at this time." Following the break, the trial court held the following discussion with counsel outside the presence of the jury:

> THE COURT: At this point we need to put some things on the record and I am going to allow the attorneys for both sides to put things on the record.
> The Court indicated it was taking a break during the direct examination of Dr. Juan Contin. What was actually occurring is that juror number five had begun weeping loudly. And the Court thought best to take a break.

---

[5] Although SX 90, another autopsy photo, was admitted into evidence, Dr. Contin never discussed SX 90 in his testimony. It is unclear to us what is depicted in this picture, though the State asserts the picture is of the interior portion of Milayna's skull cap.

The record should reflect that we are at the portion of the jury trial where autopsy photographs are coming out and these photographs—some of them, not all—are as graphic as any other type of autopsy photograph can be, but no more graphic. The Court is not saying these are not graphic photographs. Two or three that we have been discussing right before the break they are as graphic as any other criminal trial where autopsy photographs come in.

Having said that, there have been several jurors who have begun weeping with regard to some photographs that weren't of the autopsy nature. So this has happened from the beginning of this trial, to include juror number five. Juror number five has been one that has constantly had concerns with some of the photographs that have taken place.

We have taken a break. And the Court with the permission of both parties went to the jury room to indicate to the jury that this case would be going forward, and that I wanted some guidance from this jury as to whether or not we could continue today or whether they felt that they needed to conclude or attempt to conclude this trial beginning tomorrow. And it was the jury's wishes to go forward at this time.

But prior to bringing the jury in, I do want to put those matters on the record and give both parties the opportunity to put whatever matters they wish to put on the record before we bring this jury in. Ms. Hamilton, Ms. Rodriguez, anything from the State?

MS. HAMILTON: Your Honor, nothing from the State with the exception of just a notation. I was doing the direct examination of Dr. Contin during this situation so I wasn't expressly specifically looking at the jury. However, during the publishing of the photographs I did happen to note from time to time the jury's demeanor. At one point I did publish a photograph to the jury specifically not using the overhead, but with the Court's permission walked over to the jury box on one photograph that was very difficult to see. At that time I did observe each and every juror taking the time to examine the evidence.

The State has seen nothing to indicate aside from this one juror who did become upset that the jurors have been unable to listen to the evidence, to look at the evidence. And after the Court's inquiry of the jury whether or not they wanted to continue, the State is certainly read to move forward.

THE COURT: Mr. Leeds, Mr. Parra, anything you wish to put on the record on behalf of the accused.

9

MR. LEEDS: Yes, Your Honor. I mean, we still have some concepts of fundamental fairness in this courthouse. I am asking for a mistrial at this time. There is no way that my client can get a fair trial from this jury anymore. It is over for her. Juror number five had her head down.

And I would point out to the Court that right at the beginning of Dr. Contin's testimony I specifically objected to these particular autopsy photos. I said that the – assisting the jury is not a standard for getting these photos in. I said that the State already got in all the photos that they legally need. I said this was cumulative, highly prejudicial, unimaginably and wildly inflammatory, irrelevant[,] and the prejudicial effect outweighs the probative value. I was overruled. The Court allowed the prosecution to show those photos. We are talking about external and internal photos of an autopsy report. Juror number five is crying – weeping with her head down, not looking at the evidence. As they walked to the jury room she is sobbing hysterically so that you can hear her in the back of the courtroom. This is not the first time this happened in the case. Although this is the most egregious time. And her conduct has tainted the rest of the jury as far as my client is concerned. I move for a mistrial.

THE COURT: Your motion for mistrial at this time is denied. Before I bring the jury in, counsel, come just approach up front.

The trial court and counsel then had an off-the-record discussion at the bench before the jury was readmitted to the courtroom and trial was resumed. Dr. Contin then testified that the cause of death was a blunt force injury to the head with subarachnoid hemorrhage, subdural hematoma, and swelling of the brain, and the manner of death was homicide. The State asked if a hammer could cause the type of injury Milayna suffered. Dr. Contin said yes. However, a fall down carpeted stairs would not cause those injuries, and on uncarpeted stairs, the only way Milayna could have gotten the injuries she sustained was if she had fallen down each of the ten steps on the top of her head. Dr. Contin also opined that the abuse had been going on for a period of days before her death, given that some cuts had already begun healing over. He also stated that it was possible some of the bruises on her body could have been inflicted at the same time she sustained her head injury. He admitted that neither he nor anyone else at the Medical

10

Examiner's Office performed a toxicology report.

On cross-examination, Dr. Contin admitted that he had previously been dismissed and terminated as El Paso County's chief medical examiner for unsatisfactory performance. He also admitted that the Texas Medical Board had found he violated the law by committing unprofessional conduct that was likely to deceive, defraud, or injure the public. He received probation from the medical board. Dr. Contin also testified that he performed this autopsy as a contractor working under the supervision of former El Paso County Medical Examiner Dr. Paul Shrode, who was fired for lying on his resume. Dr. Contin testified that he amended the original death certificate, which originally listed "Decedent bludgeoned by assailants" under the section labeled "Describe how the injury occurred," because the letter S in the word assailants should have been in parenthesis and this came to light through questioning in a previous hearing in another case. Dr. Contin conceded that he had little independent recollection of the autopsy and that he was reliant on what he had said in the report, but he denied ever changing anything on an autopsy report at Dr. Shrode's request, and maintained he would only do so if Dr. Shrode "had a point."

Dr. Contin also clarified that while Milayna had several bruises on her head, he could not tell whether she had received all those bruises at the same time. He also testified that he did not personally inspect the stairs at the Dawkinses' apartment, and he could not remember seeing a picture of those stairs. Dr. Contin was unaware that Milayna had been taking prednisolone or any other medications until reviewing hospital records a year after her death, and he conceded that prednisolone could cause "thin skin" and easy bruising even with slight trauma, as well as weakness, a "[f]eeling of a whirling motion," sleeplessness, hives, itching, and easy bleeding, among other side effects. Dr. Contin also admitted that children bruise more easily than adults

11

and that blood diseases like Henoch-Schonlein purpura or a low platelet-count caused by thrombocytopenia could cause bleeding into the skin and could complicate analysis of the contusion. He did not rule either condition out. He also explained that lividity after death could cause blood to look like a bruise, and that skin color changes after death. Dr. Contin also testified that Milayna's injuries were consistent with the way Nakia Dawkins had said he had beaten her in the police interrogation video. On redirect, Dr. Contin also stated that if Appellant had admitted to beating the child with her hand and a belt, that would also be consistent with Milayna's injuries.

### Verdict

The jury acquitted Appellant of capital murder in Count I, but convicted her of murder in Count II. She was sentenced to thirty-three years in prison. This appeal followed.

### DISCUSSION

Appellant raises three points on appeal.[6] First, in Issues One and Two, Appellant asserts that the admission of twenty-three autopsy photos prejudiced her right to a fair trial because the pictures were irrelevant or, alternatively, substantially more prejudicial than probative—so much so that jurors began openly weeping during Dr. Contin's testimony. She contends that in light of the jury's emotional reactions, prejudice was obvious and the trial court should have granted a mistrial. Second, Appellant maintains in Issue Three that the trial evidence was insufficient to prove beyond a reasonable doubt that she murdered Milayna Harris. Because legal sufficiency is a rendition point, we address it first.

### *Legal Sufficiency*
### Standard of Review

---

[6] As a threshold matter, the State urges us to disregard arguments related to the autopsy photos as inadequately briefed. We decline to do so, as the briefing here adequately cites both the record and legal authority, and the arguments have sufficiently appraised the Court of the relevant issues.

On legal sufficiency review, we assess all trial evidence "in the light most favorable to the prosecution," to determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." [Emphasis omitted]. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex.Crim.App. 2007), *citing Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). We review all record evidence—direct or circumstantial, properly admitted or not. *Clayton*, 235 S.W.3d at 778. "Each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex.Crim.App. 2007). We measure legal sufficiency based on the statutory elements of the offense as modified by the allegations set out in the indictment. *Malik v. State*, 953 S.W.2d 234, 239 (Tex.Crim.App. 1997).

In this procedural posture, we are not permitted to sit as "thirteenth juror" and substitute our judgment for that of the fact finder, and we generally defer to the jury when the record evidence paints conflicting pictures of innocence and guilt. *Isassi v. State*, 330 S.W.3d 633, 638 (Tex.Crim.App. 2010), *Goodman v. State*, 66 S.W.3d 283, 286 n.4 (Tex.Crim.App. 2001). Even so, we act as a procedural failsafe against irrational verdicts, and we may reverse a conviction on legal sufficiency grounds where no rational juror could find guilt beyond a reasonable doubt based on the evidence presented at trial. *Clayton*, 235 S.W.3d at 778; *Amaro v. State*, No. 08-12-00198-CR, 2014 WL 1663162, at *2 (Tex.App.--El Paso Apr. 23, 2014, no pet.)(not designated for publication). This encompasses both situations in which the State has failed to prove an essential element of the crime as a matter of law and situations in which some evidence exists on every element, but no reasonable person could convict in light of the state of evidence as a whole, even when viewed most favorably to the prosecution. *See Jackson*, 443 U.S. at 320, 99

S.Ct. at 2789 (constitutional legal sufficiency standard in criminal cases higher than "mere modicum" evidence standard); *Brooks v. State*, 323 S.W.3d 893, 906-07 (Tex.Crim.App. 2010).

Where the evidence is legally insufficient to support the defendant's conviction, and reformation to a lesser-included offense is not appropriate, the court must render a judgment of acquittal. *Thorton v. State*, 425 S.W.3d 289, 299-300 (Tex.Crim.App. 2014); *Casanova v. State*, 383 S.W.3d 530, 532-23 (Tex.Crim.App. 2012).

## Analysis

The record evidence here is sufficient to uphold the jury's verdict for felony murder as alleged in Count II. That count alleged that Appellant caused Milayna's death in the course of committing injury to a child, either directly or as a party criminally responsible for another's actions. The evidence is sufficient to support a guilt finding under either theory.

Appellant is correct that there is no direct evidence in the record that would conclusively establish she inflicted the fatal blow. However, circumstantial evidence may be legally sufficient to uphold a murder conviction. "Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt." *Hooper*, 214 S.W.3d at 13.

Here, the circumstantial evidence is enough to allow a jury to infer that Appellant Shawntrell Dawkins caused Milayna's death. Both Nakia and Appellant admitted to police that they had repeatedly hit Milayna with a belt on various parts of her body, and the autopsy revealed external bruising over 40 percent of her body and internal bruising and bleeding. That is sufficient to establish the felony predicate of injury to a child. Dr. Contin's testimony establishes that the type of head injury that killed Milayna could not have been caused by a simple fall down the stairs. Instead, the subdural and subarachnoid bleeding she experienced

14

could have only been caused by substantial blunt force trauma, and Dr. Contin testified that the only way Milayna could have sustained those injuries was by falling down the stairs was if she fell down multiple, uncarpeted stairs directly on the top of her head. The autopsy also demonstrated that Milayna had ten separate bruises on the top of and back of her head. In light of that testimony and evidence, it would be rational for a jury to reject an innocent, accidental explanation for Milayna's death.

As for identity, the evidence shows that in the hours leading up to Milayna's death, only Appellant and Nakia had care, custody, and control over the children. Dr. Contin's medical testimony established that Milayna would have suffered the head injury close in time to when she fell unconscious and had trouble breathing, meaning that she could have only sustained those injuries at the hands of Appellant or Nakia. Nakia insisted that his wife was in the room with him when they both heard a loud boom and Appellant found Milayna unconscious. However, his story contains inconsistencies about where Appellant and Milayna were at various times of the evening. A rational jury could conclude that Nakia's testimony vouching for his wife's whereabouts immediately preceding the purported fall were not credible.

Even if we are incorrect that circumstantial evidence can establish beyond a reasonable doubt that Shawntrell Dawkins herself caused Milayna's death in the course of committing child abuse, the evidence is legally sufficient to convict her as a party to Milayna's murder even if Nakia Dawkins caused the injury. Appellant correctly asserts that "mere presence of a person at the scene of a crime, or even flight from the scene, without more, is insufficient to support a conviction as a party to the offense." *Gross v. State*, 380 S.W.3d 181, 186 (Tex.Crim.App. 2012). However, where a person has a legal duty to act, failure to do so may render her criminally liable under law of the parties. *See* TEX.PENAL CODE ANN. § 7.02(a)(3)(West

15

2011)(establishing that a person is a criminally responsible party if, "having a legal duty to prevent commission of the offense and acting with intent to promote or assist its commission, he fails to make a reasonable effort to prevent commission of the offense"). Cases from this Court and our sister courts make clear that a breach of a parent's duty to intervene and stop known physical child abuse may render that parent criminally liable for the consequences of another's actions.

Late last term, in a case with similar facts, this Court affirmed the capital murder conviction of a mother who failed to protect her three-year-old daughter from physical abuse at the hands of a live-in boyfriend. *Perez v. State*, No. 08-12-00340-CR, 2015 WL 4940375, at \*7-\*8 (Tex.App.--El Paso Aug. 19, 2015, no pet. h.)(not designated for publication). We held that the mother was a party to her boyfriend's murderous conduct based on a duty theory of criminal liability because she was aware of abuse but failed to intervene. *Id*.

In *Sandoval v. State*, Nos. 14-12-00879-CR & 14-12-00880-CR, 2014 WL 3870504, at \*6 (Tex.App.--Houston [14th Dist.] Aug. 7, 2014, no pet.)(mem. op., not designated for publication), the Houston Fourteenth Court, also relying on a breach of duty theory of party liability, upheld an injury to a child conviction where a mother alleged that it was actually her live-in domestic partner who struck and killed her daughter. The Court rejected that narrow approach to liability, holding that a desire to maintain domestic harmony did not excuse the mother from the duty to protect her daughter. The Court also held that it would be reasonable for a jury to disbelieve the mother's claim that she believed the injuries were not the result of abuse: "[e]ven if appellant never personally witnessed Judith or anyone else seriously injuring the complainant, each significant injury the complainant collected in her relatively short life made belief in an innocent explanation less and less reasonable." *Id*.

Finally, in *Carson v. State*, 422 S.W.3d 733, 743 (Tex.App.--Texarkana 2013, pet. ref'd), the Texarkana Court of Appeals affirmed the capital murder conviction of a mother who said and did nothing to prevent her boyfriend from torturing her baby daughter to death while he attempted to "exorcise" a "demon" that possessed the baby. While the facts in that case are more extreme than those present here, the underlying principal is the same: a parent, who has a duty to protect a child, is criminally liable for harm that befalls the child as a party to the offense if they knew a domestic partner is physically abusing the child and they fail to make reasonable efforts at intervention. *Carson*, 422 S.W.3d at 743.

Here, although Appellant was not Milayna's mother, Appellant was acting *in loco parentis* as she had express consent of Harris to act as Milayna's parent as evidenced by the power of attorney.[7] As such, she had a legal duty, same as Milayna's mother, to ensure Milayna stayed healthy and safe. While it is impossible to tell if Appellant or Nakia struck the blow that caused Milayna's death, the severity of the head injuries would make it rational for the jury to reject the innocent explanation offered by the Dawkinses, particularly in light of their inconsistent statements to police and the medical evidence and testimony. It would be rational for a jury to conclude that either Appellant or Nakia struck Milayna in the head.

We cannot say that no rational juror would convict on this record. On the contrary, Appellant's conviction rests on legally sufficient evidence and the reasonable inferences drawn

---

[7] Although neither party disputes that Appellant had a legal duty, we note that Section 9.61(a) states: "The use of force, but not deadly force, against a child younger than 18 years is justified: (1) if the actor is the child's parent or stepparent or is acting in loco parentis to the child" and "in loco parentis" is defined as "anyone who has express or implied consent of the parent . . . ." TEX.PENAL CODE ANN. § 9.61(a)(1), (b)(West 2011). The Court of Criminal Appeals in *Rey v. State*, stated in loco parentis "means 'in the place of the parent' and refers to a person who assumes the duties of a parent." 280 S.W.3d 265, 269 (Tex.Crim.App. 2009), c*iting Schrimpf v. Settegast,* 36 Tex. 296, 302–03 (1871–1872); *Coons–Andersen v. Andersen,* 104 S.W.3d 630, 634–35 (Tex.App.--Dallas 2003, no pet.). The person standing *in loco parentis* has the same rights, duties, and liabilities as a parent to the child. *Coons-Anderson,* 104 S.W.3d at 635.

therefrom.  Issue Three is overruled.

### *Autopsy Photos: Admissibility and Prejudicial Effect*

We next turn to Appellant's objections to the autopsy photos.  Appellant challenges the admission of the photographs both as a distinct appellate error, and as the predicate basis for a mistrial the lower court should have granted.  Under either an evidentiary error or mistrial approach, we review the trial court's rulings for abuse of discretion.  *Archie v. State*, 221 S.W.3d 695, 699 (Tex.Crim.App. 2007)(mistrial standard); *Torres v. State*, 71 S.W.3d 758, 760 (Tex.Crim.App. 2002)(evidentiary error standard).  Where the trial court does abuse its discretion in admitting evidence, we will disregard the error unless it affected the defendant's "substantial rights."  TEX.R.APP.P. 44.2(b).  If harmful error is present in the record, we must reverse the defendant's conviction and remand for a new trial.  We cannot grant an acquittal based on evidentiary error.  *See Watson v. State*, 204 S.W.3d 404, 420 (Tex.Crim.App. 2006)(acquittal only appropriate in meritorious legal sufficiency challenge); *Adams v. State*, 639 S.W.2d 942, 943 (Tex.Crim.App. 1982)(proper remedy for trial error is reversal and remand).

As stated previously, the twenty-three photos in question depict Milayna's body at various stages of the autopsy process.  Appellant objected on relevance grounds at trial.  The State contends the photographs were relevant under TEX.R.EVID. 401.  We agree.  "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."  *Id*.  "The identity of the victim and the manner and means of death are certainly facts that are of consequence to the determination of the action."  *Penry v. State*, 903 S.W.2d 715, 751 (Tex.Crim.App. 1995).  The autopsy photos were relevant both to establish Milayna's identity and to help the jury decide cause of death.  *See id*. (admitting pre- and post-death photos of the deceased).  The trial court

18

properly overruled Appellant's relevancy objections.

Appellant maintains that even if the photographs were relevant, the trial court abused its discretion by admitting them because the graphic photos were substantially more prejudicial that probative. As such, they were inadmissible under TEX.R.EVID. 403. We disagree.

The trial court has the discretion to exclude relevant evidence "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." TEX.R.EVID. 403. "Rule 403 favors the admission of relevant evidence and carries a presumption that relevant evidence will be more probative than prejudicial." *Gallo v. State*, 239 S.W.3d 757, 762 (Tex.Crim.App. 2007). Generally speaking, "if a verbal description of the body and the scene would be admissible, a photograph depicting the same is admissible." *Erazo v. State*, 144 S.W.3d 487, 489 (Tex.Crim.App. 2004). But that rule is not absolute:

> A photograph should add something that is relevant, legitimate, and logical to the testimony that accompanies it and that assists the jury in its decision-making duties. Sometimes this will, incidentally, include elements that are emotional and prejudicial. Our case law is clear on this point: If there are elements of a photograph that are genuinely helpful to the jury in making its decision, the photograph is inadmissible only if the emotional and prejudicial aspects substantially outweigh the helpful aspects.

*Id.* at 491-92.

In a similar case in which a criminal defendant complained about the admission of a three-year-old victim's autopsy photos, the Court of Criminal Appeals laid down several factors to consider in our Rule 403 analysis. "These factors include, but are not limited to: the number of exhibits offered, their gruesomeness, their detail, their size, whether they are black and white or color,[8] whether they are close-up, and whether the body depicted is naked or clothed." *Gallo*,

---

[8] We note that the copies of the photos we have in the appellate record are in black and white, but apparently, the copies the jury reviewed were in color. "If [Appellant] believed the colors in the actual photographs would have

239 S.W.3d at 762. "The availability of other means of proof and the circumstances unique to each individual case must also be considered." *Id*.

We agree with the trial court that these photographs were no more gruesome than ordinary autopsy photos. The first fourteen pictures only depict Milayna's body as it was received by Dr. Contin. While she is unclothed in certain pictures, the pictures also depict bruising on her body. Although several of the photos depict the same parts of the body, they did so from separate angles and from separate distances. Each photo depicted injuries, all of which tended to confirm Milayna Harris was physically abused and that her death from head trauma could not have been accidental. The most gruesome pictures, which show only her internal organs inside the abdominal cavity and her brain with the skullcap removed, were necessary to show internal bruising and bleeding that would otherwise not be visible to the naked eye.

The photographs are highly probative for another reason. By offering Dr. Contin's expert testimony, the State implicitly vouched for his qualifications and credibility. Appellant's defense, as telegraphed in opening statements, rested heavily on challenging the medical examiner's credentials, character, diligence, and truthfulness. The photographs admitted at trial verified that an autopsy was performed and allowed the jury to not only judge Milayna's injuries for themselves, but also assess whether Dr. Contin's findings could be trusted. Seeing is believing—or disbelieving. The additional probative value of these pictures in light of credibility questions weighs in favor of admissibility.

Although certain pictures depicted aspects of the autopsy that an ordinary person would find gruesome, and the emotional impact of seeing a child's corpse being clinically dissected

made a difference in our assessment of prejudice, [s]he could have ensured that either the original photographs or color photocopies were included in the record." *Troncoso v. State*, No. 06-03-00065-CR, 2004 WL 573659, at *5 n.1 (Tex.App.--Texarkana Mar. 24, 2004, pet. ref'd)(not designated for publication)(citing applicable Rules of Appellate Procedure).

cannot be denied, this was a trial for murder. Jurors are constitutionally called to assess the guilt or innocence of their peers, and images of death and tragedy are par for the course. We presume that such images are admissible, and they can only be excluded if their prejudicial effect *substantially* outweighs their probative value. TEX.R.EVID. 403. That was not the case here. These photos assisted the jury in understanding Dr. Contin's testimony about the autopsy and deciding if he was a credible witness. They also helped the jury gauge the severity of Milayna's injuries. All things considered, the scales of Rule 403 do not tip outside the zone of reasonable disagreement here. As such, we uphold the trial court's evidentiary ruling. Issue Two is overruled.

However, this does not end our inquiry. One outstanding issue remains. Appellant urges us to reverse her conviction in light of a juror's emotional reaction to the pictures, which demonstrates their prejudicial effect. The State correctly notes that we assess the emotional impact of evidence from the perspective of a person of normal sensitivity and do not consider after-the-fact reactions of jurors in deciding threshold admissibility questions. But an emotional outburst can form the basis for a mistrial separate and apart from an evidentiary ruling. *See Coble v. State*, 330 S.W.3d 253, 292 (Tex.Crim.App. 2010)(nothing that "an outburst from a bystander or witness which interferes with the normal proceedings of a trial will not result in reversible error unless the defendant shows that a reasonable probability [exists] that the conduct interfered with the jury's verdict.")[Internal quotation marks omitted]. Nevertheless, we conclude that the trial court did not abuse its discretion in refusing to grant a mistrial. There is no evidence of prejudice in the record, and as such, we defer to the trial court's discretionary decision in light of the fact that it was in an appreciably better position to determine the atmosphere of the courtroom and the effect the juror's weeping actually had. *Cf. Troncoso*, 2004

21

WL 573659, at *6 (trial court did not abuse its discretion in denying new trial where juror exited the jury box weeping and attempted to leave courtroom during presentation of autopsy photos).

Issues One and Two are overruled.

## CONCLUSION

The evidence was legally sufficient to support Appellant's conviction, and the trial court did not abuse its discretion by admitting the autopsy photos and overruling a motion for mistrial. The judgment of the trial court is affirmed.


October 14, 2016

YVONNE T. RODRIGUEZ, Justice

Before McClure, C.J., Rodriguez, J., and Larsen, Senior Judge
Larsen, Senior Judge (Sitting by assignment)

(Publish)