COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



| ERLINDA LUJAN, | § | No. 08-22-00166-CR |
| | § | |
| Appellant, | § | Appeal from the |
| | § | |
| v. | § | 243rd Judicial District Court |
| | § | |
| THE STATE OF TEXAS, | § | of El Paso County, Texas |
| | § | |
| Appellee. | § | (TC# 20160D05527) |

## **O P I N I O N**

This case arises out of a series of interrelated kidnappings and a murder. A jury convicted Appellant Erlinda Lujan in trial court case number 20160D05527 of two counts of engaging in organized criminal activity associated with the aggravated kidnappings of Isaac Lujan (Isaac) and James Tyler Hall (Hall). During the same trial, the jury also convicted Appellant in trial court case number 20160D04874 of engaging in organized criminal activity associated with the murder of Anthony Trejo and of tampering with a human corpse.[1]

In appealing case number 20160D05527, Appellant raises two issues challenging her conviction. First, she argues the trial court abused its discretion by admitting autopsy photographs

---

[1] Appellant also appeals her conviction in trial court case number 20160D04874 under a separate appeal in cause number 08-22-00165-CR.

of the victim because the risk of unfair prejudice substantially outweighed their probative value. Second, she argues the trial court abused its discretion when it overruled Appellant's objection to the prosecutor's closing argument comparing her to world leaders guilty of murder and genocide. We affirm her conviction for the following reasons.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Factual background

#### (1) *Facts associated with Hall's kidnapping*

Hall testified that in 2016, he moved to El Paso, Texas to work at a power plant. During this time, Hall met Appellant and several others eventually involved with his kidnapping, including Janet Lucero (Lucero), Isaac, Karen Castillo (or Dora), Anthony Trejo (or Lazy), and Roberto Favela (or Filero). Hall began purchasing methamphetamine from Filero, and Hall consumed methamphetamine together with Filero and Lucero.

The night before he was kidnapped, Hall was partying ("drinking, smoking meth") with Lucero, Isaac, and Castillo. That same night, they went together to a pawn shop to sell some tools they found in a vehicle belonging to a man named Adrian Herrera. Hall was told he was the only one in the group who had an ID with him, so he used it to pawn the tools for gas money to drive to California to pick up drugs. The next day, Hall drove with Lucero and Trejo to a house on Mariano Street. When they arrived, Trejo got out of the vehicle, pointed a firearm at Hall, and told him to move into the passenger seat. Hall complied, and Lucero moved to the seat behind him, threatened him with a knife, and told him, "Don't do anything stupid." Trejo drove the vehicle to a car wash, and Herrera, Filero, and Appellant arrived in another vehicle. As Trejo, Lucero, Herrera, Filero, and Appellant spoke to each other, Trejo punched Hall in the face, laughed about

2

it, then fired a round out of the firearm (that seemed to have hit Trejo's own foot), causing Trejo and Herrera to become nervous and drive away with Hall.

Trejo drove the group to a house on Ortega Court where Filero forced Hall into the house and threw him on the floor. Filero and another man, Phillip Esquer, bound Hall's feet, and hands with rope and began to question him regarding whether he was an undercover police officer and regarding the tools from Herrera's vehicle that had been pawned. The men demanded Hall's wallet and the PIN number to his debit cards, which Hall provided. About three or four hours later, the men blindfolded Hall with what he thought was electrical tape, threw him into a vehicle, and took him to an apartment on Alameda Street, where they carried him upstairs and threw him or dropped him on the apartment floor while his feet and hands were still bound.

Hall remained at the Alameda Street apartment for several days, during which time Herrera and others physically tortured and questioned Hall. He was dragged around the carpet by his feet and got carpet burns. Hall was also water boarded, subjected to questioning, had guns stuck in his mouth, got cut with a knife by Herrera (after being threatened that his finger would be cut off), got shot once by Herrera with a high-powered pellet rifle, and subjected to Herrera putting his penis in Hall's face. As Hall was tortured and questioned about drugs and the pawned tools, Appellant was present taking notes. She did not torture him herself. At some point when the others had left the apartment, Appellant removed Hall's blindfold, brought him "a dollar burger from McDonald's" and water, and smoked THC and methamphetamine with him. Appellant also "beat up" Lucero for a few minutes during Hall's captivity, "almost like a parent disciplining [a] child in a violent way." Hall later saw Trejo, who looked "pretty rough," lying in a bathtub in the apartment.

3

After Isaac had been brought to the apartment, Appellant gave Hall some clothing and threatened him to keep silent about what had happened before releasing him; Herrera also threatened Hall to keep quiet. Hall believed Appellant had made the decision to release him and recalled Appellant assuring him that he would not be killed. Hall left the apartment and eventually gave a statement to a detective. Hall admitted that this first statement was untruthful due to his claims that he did not use narcotics and that the kidnapping began in a parking lot or at a traffic light. Hall subsequently rode a bus to Louisiana and gave another statement to detectives while he was there. Hall credited Lujan for releasing him.

### (2) *Facts associated with Isaac's kidnapping*

The State called Isaac to testify and asked if he had been abducted, but Isaac only testified that Appellant had saved his life before invoking his right to avoid self-incrimination under the Fifth Amendment. After Isaac refused to answer any questions, the trial court struck his statement from the record and found him in contempt but later apologized to him.

Detective Nicholas Alvarado of the El Paso Police Department testified that on September 13, 2016, he was dispatched with his partner to a fire station because the firefighters needed a handcuff key. When Alvarado arrived, he saw Isaac with the firefighters outside the fire station. Isaac had handcuffs on, which appeared to have been on his wrists for a long time. Alvarado released Isaac, who went on his way.

### (3) *Facts associated with Trejo's murder*

#### (a) *Esquer's testimony*

The State called Phillip Esquer to testify regarding Trejo's abduction and murder, but he also invoked his Fifth-Amendment right to avoid self-incrimination despite the fact that the State had granted him immunity in exchange for his testimony. After the trial court ordered Esquer to

testify, he stated that he had been convicted of engaging in organized criminal activity associated with kidnapping Hall. In September 2016, Esquer was living with Filero at the Ortega Court house. On September 12, 2016, Filero and Trejo got into an argument at the house, and Esquer saw Filero and two other men, Romuldo Trujillo (or Sean) and Stephen Ramirez, assaulting Trejo. After the assault, Esquer gave Trujillo some cord, and Filero and Trujillo took Trejo away from the house to an unknown place. Later that night, Appellant arrived at the Ortega Court house and asked for some rags and grocery bags that Esquer later learned were used in disposing Trejo's body. Several days later, Esquer saw Trejo in the front seat of a car driven by Castillo when she arrived at the Ortega Court house, but Esquer could not determine Trejo's physical condition. Esquer did not see Trejo again after that day.

(b) *Castillo's testimony*

Castillo testified that in September 2016, she knew Appellant and Filero and had also met Trejo on several occasions. On the night of his abduction, Trejo picked Castillo up and took her to the Ortega Court house where Filero and Appellant were present. While Appellant was present in the room, Filero asked Castillo about what had happened to some tools, but Castillo was unaware of what had happened to them. Filero looked at Appellant during the questioning for "reassurance," and Appellant responded, "What are you looking at me for?" Trejo later came into the room and told Appellant and Filero that he would take her with him, but he did not threaten Castillo. Trejo drove with Castillo to another location and sexually assaulted her. Castillo fell asleep after the assault and woke up at the Alameda apartment. Castillo and a "white man" were tied up in the apartment. Castillo saw that the white man's leg was bleeding and she later learned that he had been shot with a pellet gun.

5

Eventually, Appellant and others arrived at the apartment. Castillo went into the bathroom and saw Trejo, who was unconscious, in the bathtub. Castillo overheard Appellant and another person talking about cleaning Trejo up, and she recalled hearing something to the effect of, "We can't leave him like this. Somebody has to clean him up and do something about it." Castillo found some wipes in the bathroom and began cleaning Trejo, then Trejo woke up and asked where he was and what had happened to him. Appellant eventually told Castillo she did not need to clean Trejo and told her to leave the bathroom. While she was still in the bathroom, Appellant told Castillo to pretend to scream in pain to lead the others to believe Appellant was physically assaulting her, and Castillo complied. After perhaps a day in the apartment, Appellant told Castillo that she needed to leave, gave her some money and drugs, and allowed her to leave the apartment. Castillo left the apartment and went to her father's house.

### (4) *Law-enforcement investigation*

Detective Jose Ochoa of the El Paso Police Department testified that he was assigned to conduct surveillance at the Ortega Court house after receiving information that a missing person was associated with that address. Officers subsequently obtained and executed a search warrant on the Ortega Court house, and their search showed that stained carpet had been removed from the house. Through interviewing people who came and went from the house, Ochoa learned the missing person was potentially deceased. Ochoa also learned of possible evidence at another house in Chaparral, New Mexico. When Ochoa went there, he found an extinguished bonfire with the remains of a firearm. When Ochoa learned of the connection between the Alameda apartment and the missing-person investigation, officers obtained and executed a search warrant on the apartment and found zip ties, suspicious stains on the floor, and cleaning supplies. Officers subsequently

6

determined Appellant's potential involvement in the offenses, arrested her, and interviewed her at a police station.

During the interview, Appellant told Ochoa that after Trujillo told her they had abducted Trejo, Appellant went with Trujillo and Filero and saw that Trejo had been beaten. The men told Appellant that Trejo was "a piece of shit" and that he needed to die for everything he had done, but Appellant wanted him to live. After the men dragged Trejo's body out of Trujillo's truck, Trujillo directed Appellant to take Trujillo's truck and drive Trejo to Mexico, but Appellant refused. Appellant went with Trejo to the Alameda apartment, fed him, and told Filero and Trujillo to release him, but they refused and said that they were going to kill him. The men also threatened to kill Lucero, Appellant's friend who was like a daughter to Appellant, because she was a "snitch" and knew too much. Appellant later learned that Filero and Trujillo had killed Trejo. Days later, Trujillo and Filero directed Appellant to collect four bags containing parts of Trejo's body and duct-tape them together so that if they "go down" for this, Appellant would, too. After she duct-taped the bags together inside another bag, Appellant drove with Filero and Trujillo in Trujillo's truck to drop off the body. Appellant traveled with Filero and Trujillo to an unpaved road in a desert area, but Appellant left the truck before arriving at the location where Trejo was dumped. Appellant subsequently directed the detectives to where the Trejo was buried. Officers eventually found Trejo's body, which had been dismembered. After performing an autopsy, a medical examiner testified that Trejo's cause of death was "homicide by unspecified means."

**B. Procedural history**

In cause number 20160D05527, the State charged Appellant with two counts of engaging in organized criminal activity arising from the aggravated kidnappings of Isaac (Count I) and Hall (Count II). The State also charged Appellant in cause number 20160D04874 with (1) engaging in

organized criminal activity arising from the murder of Trejo (Count I); (2) tampering with a human corpse (Count II); and (3) tampering with physical evidence, to wit: the carpet from the Ortega Court house (Count III).

The trial court granted the State's motion to consolidate cause numbers 20160D05527 and 20160D04874, and both cases were tried to a jury in the same trial. During the trial, the State offered three photographs of Trejo's body taken during his autopsy, and Appellant objected on the basis that their probative value was substantially outweighed by the risk of unfair prejudice. After the State withdrew one of the photographs, the trial court admitted the other two photographs over Appellant's objection.

The jury found Appellant guilty of both counts of engaging organized criminal activity in case number 20160D05527. Regarding case number 20160D04874, the jury found Appellant guilty of engaging in organized criminal activity arising from the murder of Trejo and tampering with a human corpse, and it found Appellant not guilty of tampering with physical evidence. During closing arguments on punishment, the prosecutor compared Appellant to world leaders who "have not gotten their hands dirty that have been responsible for . . . murder [and genocide.]" Appellant objected that the prosecutor's argument was an improper appeal to the jury's emotions, and the trial court overruled the objection. In 20160D05527, the jury assessed five years' imprisonment for Count I and fifteen years' imprisonment for Count II. In 20160D04874, the jury assessed fifty-five years' imprisonment for Count I and seventeen years' imprisonment for Count II.

This appeal followed. Appellant challenges her convictions in 20160D05527 in two issues, arguing that the trial court abused its discretion by (1) admitting the autopsy photographs over her

8

Rule-403 objection and (2) overruling her objection to the prosecutor's closing argument comparing Appellant to world leaders who commit murder and genocide.

## II. AUTOPSY PHOTOGRAPHS

In her first issue, Appellant argues the trial court abused its discretion by admitting two autopsy photographs over her Rule-403 objection.

### A. Factual background

During the trial on punishment, the State announced its intent to offer State's Exhibits 217, 218, and 219, which consisted of photographs of Trejo's body taken during his autopsy. Although Appellant conceded that the photographs were relevant, Appellant's counsel objected to their admission on the basis that the probative value of the photographs was outweighed by the risk of unfair prejudice. The State countered that the photographs were admissible because (1) State's Exhibit 217, which showed Trejo's face in a body bag, revealed the extent of the injuries to his face; (2) State's Exhibit 218, which showed Trejo's body on the medical examiner's table, depicted the body as it was found with the head and limbs removed and a restraint on Trejo's right wrist, was probative of Trejo's kidnapping; and (3) State's Exhibit 219, which showed the lower portion of Trejo's torso and his severed legs with a restraint on his left ankle, was also probative of the kidnapping.

After the parties and the trial court discussed relevant case law on the matter, Appellant acknowledged that the photographs had probative value but argued that the evidence would "potentially encourage the jury to make a decision based on an emotional basis." The court asked the State if it would withdraw State's Exhibit 217, and the prosecutor agreed. The trial court admitted State's Exhibits 218 and 219 over Appellant's Rule-403 objection.

9

## B. Standard of review and applicable law

A trial court's admission of autopsy photographs over a Rule-403 objection is reviewed for an abuse of discretion. *Chavez v. State*, No. 08-16-00084-CR, 2018 WL 2715219, at *8 (Tex. App.—El Paso June 6, 2018, pet. ref'd) (not designated for publication) (citing *Davis v. State*, 313 S.W.3d 317, 331 (Tex. Crim. App. 2010)). An abuse of discretion is not present where the decision to admit or exclude the evidence is within the "zone of reasonable disagreement." *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1990) (en banc).

Texas Rule of Evidence 403 allows a trial court to exclude otherwise relevant evidence if its probative value is substantially outweighed by one or more of the following: "unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." TEX. R. EVID. 403. "Rule 403 favors admissibility of relevant evidence, and the presumption is that relevant evidence will be more probative than prejudicial." *Montgomery*, 810 S.W.2d at 389. In performing a Rule-403 analysis, a court

> must balance (1) the inherent probative force of the proffered item of evidence along with (2) the proponent's need for that evidence against (3) any tendency of the evidence to suggest decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted.

*Gigliobianco v. State*, 210 S.W.3d 637, 641–42 (Tex. Crim. App. 2006).

In addition to these factors, a trial court should also consider the following when a party offers autopsy photographs into evidence: "(1) the number of photographs offered, (2) their gruesomeness, (3) their detail, (4) their size, (5) whether they are black and white or in color, (6) whether they are close-up, and (7) whether the body depicted is naked or clothed," as well as the

availability of other means of proof and any other circumstances unique to each case. *Chavez*, 2018 WL 2715219, at *8 (citing *Dawkins v. State*, 557 S.W.3d 592, 605–06 (Tex. App.—El Paso 2016, no pet.)); *see also Gallo v. State*, 239 S.W.3d 757, 762 (Tex. Crim. App. 2007) (recognizing these factors in considering whether the admission of photographs violates Rule 403).

### C. Analysis

Appellant argues that the record "does not give fair assurance that the erroneously admitted photographs did not influence the jury or that it influenced the jury only slightly in assessing appellant's conviction or punishment."

The photographs at issue showed Trejo's body, which had been dismembered with the head and limbs severed from the torso. Thus, the photographs depicted Trejo's death and tended to support Appellant's participation in the crimes. Moreover, they tended to corroborate Appellant's admission that she had sealed plastic bags containing the body parts. The photographs also showed restraints on Trejo's wrist and ankle, corroborating other evidence establishing he had been bound in the Alameda apartment prior to his death. For these reasons, the evidence was probative of Appellant's commission of the charged offenses and were useful to the State in proving its case and corroborating other evidence the State presented.

Lujan contends that the graphic nature of the photographs allowed the jury to render an improper decision on an emotional basis. Although the photographs were gruesome in that they showed Trejo's decomposing body with the head and limbs severed from the torso, the photographs depicted the nature and circumstances of the offenses Appellant and the other involved parties committed against Trejo. To that end, nothing in the record indicates the jury was unequipped to properly evaluate the probative force of the evidence. And although the State established through other evidence that Trejo had been bound and subsequently buried, the

photographs were not merely cumulative because they tended to corroborate the State's evidence and presented a visual picture of what witness testimony could not depict. Moreover, the State did not take an inordinate amount of time to develop or present the evidence.

The photographs were printed in color and showed Trejo's naked body, potentially increasing the likelihood of inflaming the jury's emotions. However, the trial court only admitted two photographs, reducing the likelihood of unfair prejudice. Additionally, the photographs did not depict the body's mutilated state caused by the autopsy. Instead, as Appellant's interview statements suggested, the photographs depicted the body as it had been found after one or more of her collaborators had severed the head and limbs from the torso. Finally, the record indicates that the prosecutor only held the photographs up rather than use a projector to magnify the photographs while presenting them to the jury; nothing in the record indicates that they were oversized, shot from a close-up angle, or otherwise improperly emphasized.

In sum, although the photographs were graphic and likely more graphic than what an ordinary person is accustomed to seeing on a daily basis, applying the relevant factors to the facts shows that their admission was not substantially outweighed by the risk of unfair prejudice. We conclude that the trial court's decision to admit the photographs was not outside the zone of reasonable disagreement, and thus no abuse of discretion occurred. *See Chavez*, 2018 WL 2715219, at *9 (holding that the trial court properly admitted ten autopsy photographs over the defendant's Rule-403 objection where the photographs depicted the victim's injuries, showed the defendant's involvement in the victim's death, and helped to explain a medical examiner's testimony regarding her cause of death, notwithstanding the photographs' gruesome nature, the fact that they were in color, and the prosecutor's use of a projector to show the photographs to the jury).

Accordingly, we overrule Appellant's first issue.

## III. IMPROPER JURY ARGUMENT

In her second issue, Appellant argues the trial court abused its discretion by overruling her objection to the prosecutor's argument comparing Appellant to world leaders who commit murder and genocide.

### A. Standard of review and applicable law

We review a trial court's ruling on an objection to a jury argument under the same abuse-of-discretion standard set forth above. *See Brodenx v. State*, No. 08-13-00140-CR, 2014 WL 6873143, at *2 (Tex. App.—El Paso Dec. 3, 2014, no pet.) (not designated for publication) (citing *Davis v. State*, 329 S.W.3d 798, 825 (Tex. Crim. App. 2010)). Proper jury argument generally falls within one of four areas: (1) summations of the evidence; (2) reasonable deductions from the evidence; (3) answers to argument of opposing counsel; and (4) pleas for law enforcement. *Davis*, 329 S.W.3d at 821. We must examine the challenged jury argument in the context in which it appears. *Jackson v. State*, 17 S.W.3d 664, 675 (Tex. Crim. App. 2000).

### B. Analysis

During closing arguments in the punishment phase of trial, defense counsel argued that Appellant should receive a reduced sentence because she was not the person who "actually was doing the acts" or was the "mastermind" behind the offenses but rather that she was only a party to the offenses. The prosecutor made the following statement in his closing argument:

> So [defense counsel] talked about the defendant being a party and that her conduct was just that of a party. And because of that you, should show her mercy. You should be inclined to give her less [punishment] because she didn't get her hands dirty. Let's talk about history. We've had some horrible world history. I can think of several people that have not gotten their hands dirty that have been responsible for the murder of—

Defense counsel objected that the prosecutor's argument was inappropriate, and the prosecutor replied that he was responding to defense counsel's argument. The trial court overruled the objection, and the prosecutor continued, "There have been many world leaders that have committed genocide." Defense counsel objected again because the prosecutor's argument inappropriately appealed to the jury's emotions, and the trial court again overruled the objection and replied that defense counsel "opened the door . . . [by] trying to say that she was less guilty because . . . of being a party" and that the prosecutor was "making an analogy." The prosecutor then moved on to other matters.

Considering the prosecutor's remarks in context, we conclude that the prosecutor made the argument at issue in response to defense counsel's request that the jury consider a lesser sentence because Appellant was not the person who directly committed the offenses. The prosecutor's argument that world leaders who enlist others to commit genocide are still morally culpable for their indirect participation in the killing of others was an appropriate analogy to Appellant's commission of the offense because although she may not have directly committed the kidnappings or murder, she nonetheless was a party to the offenses. *See Guerrero Lara v. State*, No. 13- 01- 099- CR, 2002 WL 1765543, at *4 (Tex. App.—Corpus Christi Aug. 1, 2002, no pet.) (not designated for publication) (where during the punishment phase, defense counsel's closing argument referred to a witness's testimony that the defendant was a good husband and father and the State responded with, "This man may have been capable of kindness on some days, but that's like saying Adolf Hitler provided for his family or Charles Manson sometimes smiled . . . ," the trial court did not err by overruling an objection to the prosecutor's argument because it was in response to defense counsel's argument).

14

The trial court acknowledged that defense counsel opened the door to the prosecutor's remarks, one of the areas of proper jury argument. *See Davis*, 329 S.W.3d at 821 ("an answer to the argument of opposing counsel" is a general area of permissible jury argument). Because the trial court was not outside the zone of reasonable disagreement when it overruled Appellant's objection to the prosecutor's argument, the court did not abuse its discretion.

Accordingly, we overrule Appellant's second issue.

## IV. CONCLUSION

We affirm the judgment supporting Appellant's conviction.


LISA J. SOTO, Justice


May 17, 2023

Before Rodriguez, C.J., Palafox, and Soto, JJ.

(Do Not Publish)