

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| ERLINDA LUJAN, | § | No. 08-22-00165-CR |
| Appellant, | § | Appeal from the |
| v. | § | 243rd Judicial District Court |
| THE STATE OF TEXAS, | § | of El Paso County, Texas |
| Appellee. | § | (TC# 20160D04874) |

## **O P I N I O N**

This case arises out a series of interrelated kidnappings and a murder. A jury convicted Appellant Erlinda Lujan in trial court case number 20160D04874 of engaging in organized criminal activity associated with the murder of Anthony Trejo and of tampering with a human corpse. The jury also convicted Appellant in trial court case number 20160D05527 of two counts of engaging in organized criminal activity associated with the aggravated kidnappings of two victims, Isaac Lujan (Isaac) and James Tyler Hall (Hall).[1]

In appealing case number 20160D04874, Appellant raises four issues challenging her conviction. First, she argues that the evidence is legally insufficient to support her conviction for

---

[1] Appellant also appeals her conviction in trial court case number 20160D05527 under a separate appeal in cause number 08-22-00166-CR.

engaging in organized criminal activity. Second, she argues that the jury charge erroneously allowed the jury to use recklessly committed aggravated assault as a predicate offense to felony murder, which in turn was used as a predicate offense to engaging in organized criminal activity. Third, Appellant argues that the trial court abused its discretion by admitting autopsy photographs of the victim because the risk of unfair prejudice substantially outweighed their probative value. Fourth and finally, she argues that the trial court abused its discretion when it overruled Appellant's objection to the prosecutor's closing argument comparing her to world leaders guilty of murder and genocide. We affirm her conviction for the following reasons.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Factual background

#### (1) *Facts associated with Hall's kidnapping*

Hall testified that in 2016, he moved to El Paso, Texas to work at a power plant. During this time, Hall met Appellant and several others eventually involved with his kidnapping, including Janet Lucero (Lucero), Isaac, Karen Castillo (or Dora), Anthony Trejo (or Lazy), and Roberto Favela (or Filero). Hall began purchasing methamphetamine from Filero, and Hall consumed methamphetamine together with Filero and Lucero.

The night before he was kidnapped, Hall was partying ("drinking, smoking meth") with Lucero, Isaac, and Castillo. That same night, they went together to a pawn shop to sell some tools they found in a vehicle belonging to a man named Adrian Herrera. Hall was told he was the only one in the group who had an ID with him, so he used it to pawn the tools for gas money to drive to California to pick up drugs. The next day, Hall drove with Lucero and Trejo to a house on Mariano Street. When they arrived, Trejo got out of the vehicle, pointed a firearm at Hall, and told

2

him to move into the passenger seat. Hall complied, and Lucero moved to the seat behind him, threatened him with a knife, and told him, "Don't do anything stupid." Trejo drove the vehicle to a car wash, and Herrera, Filero, and Appellant arrived in another vehicle. As Trejo, Lucero, Herrera, Filero, and Appellant spoke to each other, Trejo punched Hall in the face, laughed about it, then fired a round out of the firearm (that seemed to have hit Trejo's own foot), causing Trejo and Herrera to become nervous and drive away with Hall.

Trejo drove the group to a house on Ortega Court where Filero forced Hall into the house and threw him on the floor. Filero and another man, Phillip Esquer, bound Hall's feet and hands with rope and began to question him regarding whether he was an undercover police officer and regarding the tools from Herrera's vehicle that had been pawned. The men demanded Hall's wallet and the PIN number to his debit cards, which Hall provided. About three or four hours later, the men blindfolded Hall with what he thought was electrical tape, threw him into a vehicle, and took him to an apartment on Alameda Street, where they carried him upstairs and threw him or dropped him on the apartment floor while his feet and hands were still bound.

Hall remained at the Alameda Street apartment for several days, during which time Herrera and others physically tortured and questioned Hall. He was dragged around the carpet by his feet and got carpet burns. Hall was also water boarded, subjected to questioning, had guns stuck in his mouth, got cut with a knife by Herrera (after being threatened that his finger would be cut off), got shot once by Herrera with a high-powered pellet rifle, and subjected to Herrera putting his penis in Hall's face. As Hall was tortured and questioned about drugs and the pawned tools, Appellant was present taking notes. She did not torture him herself. At some point when the others had left the apartment, Appellant removed Hall's blindfold, brought him "a dollar burger from

3

McDonald's" and water, and smoked THC and methamphetamine with him. Appellant also "beat up" Lucero for a few minutes during Hall's captivity, "almost like [a] parent disciplining a child in a violent way." Hall later saw Trejo, who looked "pretty rough," lying in a bathtub in the apartment.

After Isaac had been brought to the apartment, Appellant gave Hall some clothing and threatened him to keep silent about what had happened before releasing him; Herrera also threatened Hall to keep quiet. Hall believed Appellant had made the decision to release him and recalled Appellant assuring him that he would not be killed. Hall left the apartment and eventually gave a statement to a detective. Hall admitted that this first statement was untruthful due to his claims that he did not use narcotics and that the kidnapping began in a parking lot or at a traffic light. Hall subsequently rode a bus to Louisiana and gave another statement to detectives while he was there. Hall credited Lujan for releasing him.

### (2) *Facts associated with Isaac's kidnapping*

The State called Isaac to testify and asked if he had been abducted, but Isaac only testified that Appellant had saved his life before invoking his right to avoid self-incrimination under the Fifth Amendment. After Isaac refused to answer any questions, the trial court struck his statement from the record and found him in contempt but later apologized to him.

Detective Nicholas Alvarado of the El Paso Police Department testified that on September 13, 2016, he was dispatched with his partner to a fire station because the firefighters needed a handcuff key. When Alvarado arrived, he saw Isaac with the firefighters outside the fire station. Isaac had handcuffs on, which appeared to have been on his wrists for a long time. Alvarado released Isaac, who went on his way.

4

### (3) *Facts associated with Trejo's murder*

#### (a) *Esquer's testimony*

The State called Phillip Esquer to testify regarding Trejo's abduction and murder, but he also invoked his Fifth-Amendment right to avoid self-incrimination despite the fact that the State had granted him immunity in exchange for his testimony. After the trial court ordered Esquer to testify, he stated that he had been convicted of engaging in organized criminal activity associated with kidnapping Hall. In September 2016, Esquer was living with Filero at the Ortega Court house. On September 12, 2016, Filero and Trejo got into an argument at the house, and Esquer saw Filero and two other men, Romuldo Trujillo (or Sean) and Stephen Ramirez, assaulting Trejo. After the assault, Esquer gave Trujillo some cord, and Filero and Trujillo took Trejo away from the house to an unknown place. Later that night, Appellant arrived at the Ortega Court house and asked for some rags and grocery bags that Esquer later learned were used in disposing Trejo's body. Several days later, Esquer saw Trejo in the front seat of a car driven by Castillo when she arrived at the Ortega Court house, but Esquer could not determine Trejo's physical condition. Esquer did not see Trejo again after that day.

#### (b) *Castillo's testimony*

Castillo testified that in September 2016, she knew Appellant and Filero and had also met Trejo on several occasions. On the night of his abduction, Trejo picked Castillo up and took her to the Ortega Court house where Filero and Appellant were present. While Appellant was present in the room, Filero asked Castillo about what had happened to some tools, but Castillo was unaware of what had happened to them. Filero looked at Appellant during the questioning for "reassurance," and Appellant responded, "What are you looking at me for?" Trejo later came into the room and

told Appellant and Filero that he would take her with him, but he did not threaten Castillo. Trejo drove with Castillo to another location and sexually assaulted her. Castillo fell asleep after the assault and woke up at the Alameda apartment. Castillo and a "white man" were tied up in the apartment. Castillo saw that the white man's leg was bleeding and she later learned that he had been shot with a pellet gun.

Eventually, Appellant and others arrived at the apartment. Castillo went into the bathroom and saw Trejo, who was unconscious, in the bathtub. Castillo overheard Appellant and another person talking about cleaning Trejo up, and she recalled hearing something to the effect of, "We can't leave him like this. Somebody has to clean him up and do something about it." Castillo found some wipes in the bathroom and began cleaning Trejo, then Trejo woke up and asked where he was and what had happened to him. Appellant eventually told Castillo she did not need to clean Trejo and told her to leave the bathroom. While she was still in the bathroom, Appellant told Castillo to pretend to scream in pain to lead the others to believe Appellant was physically assaulting her, and Castillo complied. After perhaps a day in the apartment, Appellant told Castillo that she needed to leave, gave her some money and drugs, and allowed her to leave the apartment. Castillo left the apartment and went to her father's house.

### (4) *Law-enforcement investigation*

Detective Jose Ochoa of the El Paso Police Department testified that he was assigned to conduct surveillance at the Ortega Court house after receiving information that a missing person was associated with that address. Officers subsequently obtained and executed a search warrant on the Ortega Court house, and their search showed that stained carpet had been removed from the house. Through interviewing people who came and went from the house, Ochoa learned the

6

missing person was potentially deceased. Ochoa also learned of possible evidence at another house in Chaparral, New Mexico. When Ochoa went there, he found an extinguished bonfire with the remains of a firearm. When Ochoa learned of the connection between the Alameda apartment and the missing-person investigation, officers obtained and executed a search warrant on the apartment and found zip ties, suspicious stains on the floor, and cleaning supplies. Officers subsequently determined Appellant's potential involvement in the offenses, arrested her, and interviewed her at a police station.

During the interview, Appellant told Ochoa that after Trujillo told her they had abducted Trejo, Appellant went with Trujillo and Filero and saw that Trejo had been beaten. The men told Appellant that Trejo was "a piece of shit" and that he needed to die for everything he had done, but Appellant wanted him to live. After the men dragged Trejo's body out of Trujillo's truck, Trujillo directed Appellant to take Trujillo's truck and drive Trejo to Mexico, but Appellant refused. Appellant went with Trejo to the Alameda apartment, fed him, and told Filero and Trujillo to release him, but they refused and said that they were going to kill him. The men also threatened to kill Lucero, Appellant's friend who was like a daughter to Appellant, because she was a "snitch" and knew too much. Appellant later learned that Filero and Trujillo had killed Trejo. Days later, Trujillo and Filero directed Appellant to collect four bags containing parts of Trejo's body and duct-tape them together so that if they "go down" for this, Appellant would, too. After she duct-taped the bags together inside another bag, Appellant drove with Filero and Trujillo in Trujillo's truck to drop off the body. Appellant traveled with Filero and Trujillo to an unpaved road in a desert area, but Appellant left the truck before arriving at the location where Trejo was dumped. Appellant subsequently directed the detectives to where the Trejo was buried. Officers eventually

7

found Trejo's body, which had been dismembered. After performing an autopsy, a medical examiner testified that Trejo's cause of death was "homicide by unspecified means."

## B. Procedural history

In cause number 20160D05527, the State charged Appellant with two counts of engaging in organized criminal activity arising from the aggravated kidnappings of Isaac (Count I) and Hall (Count II). The State also charged Appellant in cause number 20160D04874 with (1) engaging in organized criminal activity arising from the murder of Trejo (Count I); (2) tampering with a human corpse (Count II); and (3) tampering with physical evidence, to wit: the carpet from the Ortega Court house (Count III).

The trial court granted the State's motion to consolidate cause numbers 20160D05527 and 20160D04874, and both cases were tried to a jury in the same trial. During the trial, the State offered three photographs of Trejo's body taken during his autopsy, and Appellant objected on the basis that their probative value was substantially outweighed by the risk of unfair prejudice. After the State withdrew one of the photographs, the trial court admitted the other two photographs over Appellant's objection.

The jury found Appellant guilty of both counts of engaging organized criminal activity in case number 20160D05527. Regarding case number 20160D04874, the jury found Appellant guilty of engaging in organized criminal activity arising from the murder of Trejo and tampering with a human corpse, and it found Appellant not guilty of tampering with physical evidence. During closing arguments on punishment, the prosecutor compared Appellant to world leaders who "have not gotten their hands dirty that have been responsible for … murder [and genocide.]" Appellant objected that the prosecutor's argument was an improper appeal to the jury's emotions,

8

and the trial court overruled the objection. In 20160D05527, the jury assessed five years' imprisonment for Count I and fifteen years' imprisonment for Count II. In 20160D04874, the jury assessed fifty-five years' imprisonment for Count I and seventeen years' imprisonment for Count II.

This appeal followed. Appellant challenges her convictions in 20160D04874 in four issues, arguing that (1) the evidence is legally insufficient to support her conviction for engaging in organized criminal activity; (2) the jury charge erroneously allowed the jury to find that Appellant recklessly committed aggravated assault as a predicate offense to felony murder used to support the engaging-in-organized-criminal activity charge, thus violating the "merger doctrine"; (3) the trial court abused its discretion by admitting the autopsy photographs over her Rule-403 objection; and (4) the trial court abused its discretion by overruling her objection to the prosecutor's closing argument comparing Appellant to world leaders who commit murder and genocide.

## II. LEGAL SUFFICIENCY

In her first issue, Appellant argues that the evidence is legally insufficient to support her conviction for engaging in organized criminal activity associated with Trejo's murder. For the following reasons, we disagree.

### A. Standard of review

The Fourteenth Amendment's due process guarantee requires that legally sufficient evidence support every conviction. *See Jackson v. Virginia*, 443 U.S. 307, 315–16 (1979); *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010). In a legal-sufficiency challenge, we focus solely on whether the evidence, when viewed in the light most favorable to the verdict, would permit *any* rational jury to find the essential elements of the offense beyond a reasonable doubt.

9

*Jackson*, 443 U.S. at 318–19; *Brooks*, 323 S.W.3d at 912 (establishing legal sufficiency under *Jackson v. Virginia* as the only standard for review of the evidence).

We recognize that the jury is the sole arbiter of witness credibility and the weight attached to witness testimony. *Metcalf v. State*, 597 S.W.3d 847, 855 (Tex. Crim. App. 2020); *Dobbs*, 434 S.W.3d at 170. Only the jury acts "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007) (quoting *Jackson*, 443 U.S. at 319). In doing so, the jury may choose to believe or disbelieve any testimony. *Lancon v. State*, 253 S.W.3d 699, 707 (Tex. Crim. App. 2008). When the record supports conflicting inferences, we presume that the jury resolved the conflicts in favor of the verdict and defer to that determination. *Dobbs v. State*, 434 S.W.3d 166, 170 (Tex. Crim. App. 2014) (citing *Jackson*, 443 U.S. at 319). In conducting a legal-sufficiency review, "[w]e are not to sit as a thirteenth juror reweighing the evidence or deciding whether we believe the evidence established the element in contention beyond a reasonable doubt[.]" *Blankenship v. State*, 780 S.W.2d 198, 207 (Tex. Crim. App. 1988) (en banc). Instead, "we test the evidence to see if it is at least conclusive enough for a reasonable factfinder to believe based on the evidence that the element is established beyond a reasonable doubt." *Id.* (quoting *Jackson*, 443 U.S. at 318).

We consider the sufficiency of the evidence by measuring it against the hypothetically correct jury charge, which "accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Ramjattansingh v. State*, 548 S.W.3d 540, 546 (Tex. Crim. App. 2018) (citation omitted).

10

### B. Applicable law

On appeal, Appellant challenges her conviction for engaging in organized criminal activity associated with Trejo's murder. As applicable here, a person commits engaging in organized criminal activity "if, with the intent to establish, maintain, or participate in a combination . . . , the person commits or conspires to commit . . . murder[.]" TEX. PENAL CODE ANN. § 71.02(a)(1). A "combination" means "three or more persons who collaborate in carrying on criminal activities." *Id.* § 71.01(a). "Conspires to commit" means "that a person agrees with one or more persons that they or one or more of them engage in conduct that would constitute the offense and that person and one or more of them perform an overt act in pursuance of the agreement. An agreement constituting conspiring to commit may be inferred from the acts of the parties." *Id.* § 71.01(b).

The State charged Lujan under the combination theory, alleging that she "with the intent to establish, maintain, or participate in a combination or in the profits of a combination with Steven Ramirez, Roberto Favela, Romuldo Trujillo, or Adrian Herrera, did then and there commit the criminal offense of Murder." Because the State relied on the combination theory, it was required to prove continuity in the combination in which Appellant and at least two other persons intended and "agreed to work together in a continuing course of criminal activities." *See Nguyen v. State*, 1 S.W.3d 694, 697 (Tex. Crim. App. 1999) (en banc) (citation omitted). The State had to prove that the defendant "intended to 'establish, maintain, or participate in' a group of three or more, in which the members intend to work together in a continuing course of criminal activities." *Id.* All of the acts associated with the alleged criminal activity need not be criminal offenses themselves, and the acts viewed in the context of furthering a criminal activity may provide evidence of intent to do more than agree to commit a single crime. *See id.*

11

In this case, the State alleged murder as the predicate criminal activity associated with the engaging-in-organized-criminal-activity charge. A person commits murder if she (1) intentionally or knowingly causes the death of another individual; (2) intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual; or (3) commits or attempts to commit a felony, other than manslaughter, and in the course and furtherance of the commission or attempt, she commits or attempts to commit an act clearly dangerous to human life that causes the death of an individual. TEX. PENAL CODE ANN. §§ 19.02(b)(1)–(3).

The State's case further rested on the notion that Appellant participated in Trejo's murder as a party. Under the law of parties, "A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both," and "[e]ach party to an offense may be charged with commission of the offense." TEX. PENAL CODE ANN. §§ 7.01(a), (b). As applicable here, a person is criminally responsible for another's conduct if, "acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense." *Id.* § 7.02(b). Thus, the law of parties allows the State to enlarge a defendant's criminal responsibility to acts in which she may not be the primary actor, which depends at least in part on the conduct of another person. *Goff v. State*, 931 S.W.2d 537, 544 (Tex. Crim. App. 1996) (en banc). Although mere presence at the scene of an offense is not sufficient to support a conviction under a parties theory, it is a relevant circumstance tending to show guilt that, when combined with other facts shown through direct or circumstantial evidence, may establish the defendant's

status as a participant to the offense. *See Beardsley v. State*, 738 S.W.2d 681, 685 (Tex. Crim. App. 1987) (en banc).

### C. Analysis

Appellant does not challenge the legal sufficiency of the evidence establishing that her activities constituted a combination as that term is defined under the Penal Code. Instead, she argues that evidence of her involvement as a party in the underlying offense of Trejo's murder is legally insufficient. She contends that the only evidence establishing her promotion or assistance to the commission of the murder was (1) her presence when Trejo held Hall at gunpoint; (2) her presence at the Ortega Court house after Filero, Trujillo, and Ramirez assaulted Trejo; (3) her refusal to Filero and Trujillo's insistence that she kill Trejo or take him to Mexico in Trujillo's truck; (4) her presence with Trejo at the Alameda apartment; (5) her discussion of whether to clean Trejo and her statement to Castillo that Trejo did not need to be cleaned up; and (6) her assistance in taking the bags containing parts of Trejo's body to the desert.

However, contrary to Appellant's assertion, the record indicates more than Appellant's mere presence or passive participation in Trejo's murder and other associated criminal activity, all of which occurred continuously over a span of at least several days. The evidence suggests that Appellant first became directly involved with Trejo's murder in the immediate aftermath of his beating by Filero, Trujillo, and Stephen Ramirez. After Filero and Trujillo assaulted Trejo and took him out of the Ortega Court house, Appellant appeared at the house, apologized to Esquer, and asked for some rags and bags. As the State argues, this evidence circumstantially supports the notion that Appellant took at least some responsibility for Trejo's beating and abduction and was involved in the clean-up process.

13

Following the assault, Appellant admitted that she transported Trejo in Trujillo's truck, but she apparently refused Filero's and Trujillo's demand that she kill Trejo or take him to Mexico. Trejo eventually ended up at the Alameda apartment, and Hall and Castillo testified that they saw him lying in the bathtub in a badly beaten condition while he was going in and out of consciousness. According to Castillo, Appellant took charge of Trejo's captivity, and Castillo overheard Appellant talking about Trejo with another person to the effect of, "We can't leave him like this. Somebody has to clean him up and do something about it." When Castillo began to clean Trejo, Appellant told her that she did not need to do so and ordered her to leave the bathroom. After Trejo's death, Appellant admitted to bagging his dismembered corpse and traveling to the desert with other members of the group to dispose of the body. From this evidence, the jury could have reasonably inferred that Appellant, who had engaged in concealing evidence that Trejo had been assaulted and had taken charge of Trejo's custody at the apartment, knew that he was going to be killed. Moreover, this evidence established that she aided Filero, Trujillo, and others in accomplishing Trejo's eventual murder by concealing evidence of his assault and continuing to hold him and assume responsibility for his confinement until he could be killed. Thus, the record supports a finding of Appellant's intent to participate in Trejo's murder as a party.

Regarding the combination element, the evidence shows that Appellant and others participated a continuous course of criminal activity motivated by revenge for the victims' actions. This activity lasted at least several days, involved multiple victims, and constituted kidnappings, physical torture, and murder. In Hall's and Isaac's cases, Appellant and others kidnapped them because they had stolen and pawned tools from Herrera's truck. In Trejo's case, his assault, kidnapping, and eventual murder seem to have stemmed, at least in part, from his sexual assault

of Castillo, with whom Appellant had a close relationship to the point where Appellant considered her like a daughter.

While there is no direct evidence that Appellant herself led the kidnapping, torturing, or killing of any person, the evidence shows that she was a relatively constant fixture and assisted in committing these crimes. For example, when Hall was interrogated and physically tortured at the Alameda apartment, Appellant was present in the room and recorded Hall's responses on a notepad, showing her direct involvement in the interrogation process and something more than her mere presence while the criminal activity was ongoing. Appellant also removed Hall's blindfold, gave him food and water, and consumed narcotics with him while he was being imprisoned and tortured before she eventually released him after warning him not to say anything about his captivity.

When Trejo was beaten and taken from the Ortega Court house, Appellant appeared shortly afterward, apologized for the incident, and asked for cleaning supplies, which could reasonably be inferred to be for concealing the evidence that the assault had been committed. The evidence further suggests that Appellant took charge of custody over at least Hall and Trejo when they were being held at the Alameda apartment. And although she expressed reticence about disposing of Trejo's body parts (an act constituting the criminal offense of tampering with a human corpse), she nonetheless directly assisted Filero, Trujillo, and others in doing so. All of this evidence suggests a continuing course of criminal activities Appellant participated in with at least two other people, and thus the combination element was proven. *See* TEX. PENAL CODE ANN. § 71.01(a)(1).

**D. Conclusion**

Given the strength of this circumstantial evidence, the jury could have rationally concluded that through her words and actions, Appellant intended to act as a party by soliciting, encouraging, directing, aiding, or attempting to aid in Trejo's murder. *See Clayton*, 235 S.W.3d at 778 (recognizing that direct and circumstantial evidence are treated equally and that circumstantial evidence is as probative as direct evidence in establishing a defendant's guilt and can alone be sufficient to establish guilt) (citation omitted). Viewing the evidence in the light most favorable to the verdict, a rational jury could have found beyond a reasonable doubt that Appellant acted as a party to Trejo's murder while intending to participate in a continuous course of criminal activities with at least two other people, thus establishing Appellant's guilt of engaging in organized criminal activity associated with Trejo's murder through legally sufficient evidence. *See Jones v. State*, 05- 20-00304-CR, 2022 WL 4376713, at *8–9 (Tex. App.—Dallas Sept. 22, 2022, pet. ref'd) (mem. op., not designated for publication) (holding that legally sufficient evidence supported the defendant's conviction for engaging in organized criminal activity under a combination theory where the evidence showed the defendant (1) was involved in narcotics trafficking and multiple murders; (2) participated in the criminal activity through his expressed desire to sell narcotics and his surveillance of the victims before they were killed; and (3) assisted in covering up the commission of the offenses).

Accordingly, we overrule Appellant's first issue.

### III. JURY CHARGE

In her second issue, Appellant argues that the jury charge was erroneous because it permitted the jury to convict her of felony murder based on the predicate offense of aggravated assault with a culpable mental state of recklessness. Appellant further argues that she was harmed

16

by this error, requiring reversal of the conviction. Although we agree that the charge was erroneous, the error does not warrant reversal.

### A. Standard of review

A trial court must charge the jury on the law applicable to the case. *See* TEX. CODE CRIM. PROC. ANN. art. 36.14; *Ouellette v. State*, 353 S.W.3d 868, 870 (Tex. Crim. App. 2011). "Appellate review of a jury charge error involves a two-step process." *Frias v. State*, No. 08-13-00325-CR, 2019 WL 101935, at *3 (Tex. App.—El Paso Jan. 4, 2019, pet. ref'd) (not designated for publication). First, we must determine whether there was error in the jury charge; second, if there was error, we must determine whether sufficient harm resulted so as to require reversal. *Id.*; *see Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984) (en banc).

### B. The charge was erroneous

#### (1) *The charge language*

Within its abstract section, the charge defined "Murder" as follows.

> A person commits "**Murder**" if he intentionally or knowingly causes the death of an individual; intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual; or commits or attempts to commit a felony, other than manslaughter, and in the course of and in furtherance of the commission or attempt, or in immediate flight from the commission or attempt, he commits or attempts to commit an act clearly dangerous to human life that causes the death of an individual.

The charge defined "Aggravated Assault" as follows.

> A person commits "**Aggravated Assault**" if the person intentionally, knowingly, or recklessly causes bodily injury to another and the person uses or exhibits a deadly weapon during the commission of the offense or causes serious bodily injury.

Regarding "Engaging in Organized Criminal Activity," the charge provided:

> A person commits "**Engaging in Organized Criminal Activity**" if, with the intent to establish, maintain, or participate in a combination or in the profits of a

combination, he commits or conspires to commit the offense of murder or aggravated kidnapping.

The charge provided the following definitions for culpable mental states:

A person acts "**intentionally,**" or with intent, with respect to a result of his conduct when it is his conscious objective or desire to cause the result.

A person acts "**knowingly,**" or with knowledge, with respect to the result of his conduct when he is aware that his conduct is reasonably certain to cause the result.

The charge also provided the following language regarding the law of parties:

Under the law of parties, a person is criminally responsible for an offense committed by the conduct of another if "acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense."

And finally, the application paragraph regarding the count for the engaging-in-organized-criminal-activity charge read in relevant part as follows.

Now if you find from the evidence beyond a reasonable doubt that on or about the 12th day of September 2016 in El Paso County, Texas the Defendant ERLINDA LUJAN, either acting alone or as a party, did then and there, with intent to establish, maintain, or participate in a combination or in the profits of a combination with Adrian Herrera, Roberto Favela, Romuldo Trujillo, or Steven Ramirez, did then and there commit the criminal offense of Murder . . . then you shall find Defendant ERLINA LUJAN guilty of Engaging in Organized Criminal Activity as alleged in Count I of the Indictment.

### (2) *Analysis*

On appeal, Appellant argues that the charge was erroneous because the felony-murder portion within the definition of "murder" allowed the jury to convict Appellant of murder by recklessly committing aggravated assault—a lesser-included offense of manslaughter, which is statutorily prohibited from use as a predicate offense for felony murder under the "merger" doctrine. *See* Tex. Penal Code Ann. § 19.02(b)(3) (excluding manslaughter as an available predicate felony in a felony-murder prosecution); *Ghose v. State*, Nos. 14-20-00313-CR, 14-20-

18

00314-CR, 2022 WL 320958, at *3 (Tex. App.—Houston [14th Dist.] Feb. 3, 2022, pet. ref'd) (recognizing that recklessly committed aggravated assault is a lesser-included offense of felony murder and cannot be used as a predicate offense under the merger doctrine).

Appellant relies on *Keen v. State*, where the Austin court of appeals considered a jury charge in a murder prosecution that allowed the jury to convict the defendant of felony murder with a predicate felony of aggravated assault causing bodily injury with a culpable mental state of recklessness. No. 03-19-00744-CR, 2021 WL 4819078, at *6 (Tex. App.—Austin Oct. 15, 2021, pet. ref'd) (mem. op., not designated for publication). The court found that the charge was erroneous in this regard, reasoning that because recklessly committed aggravated assault and manslaughter share the same culpable mental state, that form of aggravated assault is a lesser-included offense of manslaughter (as opposed to either intentionally or knowingly committed aggravated assault, which are not lesser-included offenses of manslaughter). *Id.* at *7. The court further recognized that recklessly committed aggravated assault cannot serve as a predicate felony for a felony-murder charge. *Id*. Thus, because the charge's application paragraphs allowed the jury to use aggravated assault, and the abstract paragraphs defined aggravated assault as capable of being proven by recklessness, nothing in the charge prevented the jury from improperly using reckless aggravated assault as the predicate felony for the felony-murder charge. *Id.*

The charge before us included "recklessly" as a potential culpable mental state for committing aggravated assault, which was one felony that could be used as a predicate for felony murder. And in turn, the charge allowed felony murder as a potential predicate offense for the charge of engaging in organized criminal activity. These instructions allowed for the jury to possibly find that Appellant engaged in organized criminal activity by participating in murder,

19

including felony murder, which in turn could have been shown through Appellant's intentional, knowing, or reckless commission or attempted commission of aggravated assault. For these reasons, the inclusion of "recklessly" in the definition of a lesser-included offense of manslaughter (here, aggravated assault) that could have been used as a predicate offense for felony murder constituted error under the merger doctrine. *See id.*

### C. The error was not harmful

Although the charge erroneously included "recklessly" in the definition of aggravated assault, for the following reasons we find that the error was not harmful.

### (1) *Egregious harm is the appropriate harm standard*

For jury-charge error, the applicable harm standard depends on whether the defendant objected to the error at trial. *Reeves v. State*, 420 S.W.3d 812, 816 (Tex. Crim. App. 2013). Where the defendant objected to the trial court's proposed charge, the record must only show "some harm" to justify reversal. *Id.* But if the defendant did not object to the error, the error must have been "fundamental" in nature and must have caused egregious harm to warrant reversal. *Id.*

During the charge conference at trial, the trial court submitted a proposed definition of murder as set forth above. Defense counsel objected to the charge and requested that "intends to" be included immediately before the phrase "commit or attempts to commit [a felony]" within the definition of murder. When asked why he wanted the language included, defense counsel responded that "there should be a culpable mental state placed in that definition of murder," or in the alternative that the entire section of the definition for felony murder be removed. The State responded that the proposed addition was unnecessary because the charge's language properly tracked TEX. PENAL CODE ANN. § 19.02(b), and the trial court agreed and overruled Appellant's

20

objection. Defense counsel additionally objected that the language should be removed because the evidence was insufficient to permit issuance of a charge on felony murder, and the trial court also overruled that objection.

Although Appellant contends that she properly objected to the jury charge, the State counters that while Appellant objected to this portion of the charge, she did not specifically object to the charge's definition of "aggravated assault" or request that the term "recklessly" be removed from the charge, which would comport with Appellant's complaint on appeal. The State argues that because Appellant failed to properly object to the charge on that basis, the applicable harm standard is egregious harm. We agree with the State that because Appellant did not specifically object to the charge on the same basis as her appellate complaint, the standard for reversal is the less stringent egregious-harm standard. *See Reeves*, 420 S.W.3d at 816. Regardless, in this case, there was no reversable error.

### (2) *Egregious harm not shown*

Under both the some-harm and egregious-harm analyses, "the reviewing court . . . [must] find that the defendant suffered some actual, rather than merely theoretical, harm from the error" to justify reversal. *Id.* (citation and internal quotation marks omitted). Actual harm is shown where the charge error "affected the very basis of the case, deprive[d] the defendant of a valuable right, or vitally affect[ed] a defensive theory." *Cosio v. State*, 353 S.W.3d 766, 777 (Tex. Crim. App. 2011) (citation and internal quotation marks omitted). When assessing a record for egregious harm, we examine (1) the entire jury charge; (2) the state of the evidence, including the contested issues at trial and the weight of the probative evidence; (3) the parties' arguments; and (4) any other

21

relevant information in the record. *Id.* (citation omitted); *see Almanza*, 686 S.W.2d at 171 (setting forth these factors). We consider each factor in turn.

(a) *The jury charge*

The charge did not emphasize or even include a definition for the term "recklessly." Other than within the definition of "aggravated assault," the term "recklessly" does not appear elsewhere in the charge, including within the charge's application paragraph. Moreover, the charge's definition section provided the statutory definitions for "intentionally" and "knowingly," thus focusing the jury's attention on those culpable mental states that would properly support the use of aggravated assault as the underlying felony for felony murder. *See Ghose*, 2022 WL 320958, at *3. Finally, the charge's application paragraph focused on Appellant's intent to engage in criminal activity in a combination, not her recklessness to do so. And absent evidence to the contrary, which we do not find here, we must presume that the jury followed the trial court's instructions, including by applying the definitions for "intentionally" and "knowingly" as they relate to conduct in the commission of aggravated assault. *See Renteria v. State*, 206 S.W.3d 689, 707 (Tex. Crim. App. 2006) (a jury is presumed to follow a trial court's instructions absent evidence suggesting otherwise).

Considering the charge as a whole, the risk of the jury improperly using recklessness as a culpable mental state for aggravated assault was minimal, and this factor weighs against a harm finding. *See Sanchez v. State*, 376 S.W.3d 767, 775 (Tex. Crim. App. 2012) ("In a jury charge alleging alternative theories, harm must be measured at least in part[] against the likelihood that the jury's verdict was actually based upon an alternative available theory of culpability not affected by erroneous portions of the charge.") (citation and internal quotation marks omitted).

22

(b)  *The state of the evidence*

As recounted above, the record contains legally sufficient evidence that Appellant acted as a party in engaging in organized criminal activity associated with Trejo's murder. And as the State contends, the evidence suggests Appellant's intent to commit the acts associated with the charged offense, not her recklessness through her conscious disregard of a substantial and unjustifiable risk that Trejo's death would result due to her actions. *See* TEX. PENAL CODE ANN. § 6.03(c) ("A person acts recklessly, or is reckless, with respect to . . . the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur."). This factor also weighs against a finding of harm. *See Sanchez*, 376 S.W.3d at 775– 76 (recognizing that a defendant is not usually harmed by the submission of erroneous manner and means of committing an offense if the evidence otherwise suffices to prove any of the alternative, non-erroneous manners and means of committing the offense).

(c)  *The parties' arguments*

Like the evidence presented at trial, the parties' arguments focused on Appellant's intent to commit the alleged acts, not her recklessness. During voir dire, the State provided the jury panel the definitions for and examples of "intentional" and "knowing" behavior, but neither party mentioned "recklessness" or an example of reckless behavior. Defense counsel also referred to a defendant's intent and used hypotheticals to emphasize that culpable mental state, but he did not refer to recklessness. During closing arguments, defense counsel also referenced his use of "intent" during voir dire and he argued that Appellant was required to have intentionally committed murder or kidnapping to be convicted of the engaging-in-organized-criminal-activity charge. Finally, neither party mentioned recklessness in closing arguments. Because neither party referred to

23

recklessness, the chance that the jury relied on that culpable mental state was correspondingly low, and this factor also weighs against a finding of harm. *See Frias*, 2019 WL 101935, at *6 (recognizing that the parties' emphasis on other issues than the matter forming the basis for charge error made it unlikely that the error affected the jury's decision).

### (d) *Other relevant information*

Neither party points us to any other relevant information in the record, and we likewise find no other information that would aid us in our decision.

### D. Conclusion

In sum, although the charge erroneously contained the term "recklessly," the majority of the *Almanza* factors weigh against a finding of egregious harm. We thus conclude that the error caused by the inclusion of "recklessly" in the definition for aggravated assault was harmless. *See Keen*, 2021 WL 4819078, at *9–10 (holding that a charge's error in including "recklessly" in a predicate offense for felony murder was not egregiously harmful where (1) the charge otherwise instructed the jury properly; (2) the evidence supported the defendant's intentional and knowing behavior instead of his reckless behavior; and (3) the prosecutors emphasized the defendant's knowing behavior and deemphasized his recklessness).

Accordingly, we overrule Appellant's second issue.

## IV. AUTOPSY PHOTOGRAPHS

In her third issue, Appellant argues the trial court abused its discretion by admitting two autopsy photographs over her Rule-403 objection. For the following reasons, we disagree.

### A. Factual background

24

During the trial on punishment, the State announced its intent to offer State's Exhibits 217, 218, and 219, which consisted of photographs of Trejo's body taken during his autopsy. Although Appellant conceded that the photographs were relevant, Appellant's counsel objected to their admission on the basis that the probative value of the photographs was outweighed by the risk of unfair prejudice. The State countered that the photographs were admissible because (1) State's Exhibit 217, which showed Trejo's face in a body bag, revealed the extent of the injuries to his face; (2) State's Exhibit 218, which showed Trejo's body on the medical examiner's table, depicted the body as it was found with the head and limbs removed and a restraint on Trejo's right wrist, was probative of Trejo's kidnapping; and (3) State's Exhibit 219, which showed the lower portion of Trejo's torso and his severed legs with a restraint on his left ankle, was also probative of the kidnapping.

After the parties and the trial court discussed relevant case law on the matter, Appellant acknowledged that the photographs had probative value but argued that the evidence would "potentially encourage the jury to make a decision based on an emotional basis." The court asked the State if it would withdraw State's Exhibit 217, and the prosecutor agreed. The trial court admitted State's Exhibits 218 and 219 over Appellant's Rule-403 objection.

### B. Standard of review and applicable law

A trial court's admission of autopsy photographs over a Rule-403 objection is reviewed for an abuse of discretion. *Chavez v. State*, No. 08-16-00084-CR, 2018 WL 2715219, at *8 (Tex. App.—El Paso June 6, 2018, pet. ref'd) (not designated for publication) (citing *Davis v. State*, 313 S.W.3d 317, 331 (Tex. Crim. App. 2010)). An abuse of discretion is not present where

the decision to admit or exclude the evidence is within the "zone of reasonable disagreement." *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1990) (en banc).

Texas Rule of Evidence 403 allows a trial court to exclude otherwise relevant evidence if its probative value is substantially outweighed by one or more of the following: "unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." TEX. R. EVID. 403. "Rule 403 favors admissibility of relevant evidence, and the presumption is that relevant evidence will be more probative than prejudicial." *Montgomery*, 810 S.W.2d at 389. In performing a Rule-403 analysis, a court

> must balance (1) the inherent probative force of the proffered item of evidence along with (2) the proponent's need for that evidence against (3) any tendency of the evidence to suggest decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted.

*Gigliobianco v. State*, 210 S.W.3d 637, 641–42 (Tex. Crim. App. 2006).

In addition to these factors, a trial court should also consider the following when a party offers autopsy photographs into evidence: "(1) the number of photographs offered, (2) their gruesomeness, (3) their detail, (4) their size, (5) whether they are black and white or in color, (6) whether they are close-up, and (7) whether the body depicted is naked or clothed," as well as the availability of other means of proof and any other circumstances unique to each case. *Chavez*, 2018 WL 2715219, at *8 (citing *Dawkins v. State*, 557 S.W.3d 592, 605–06 (Tex. App.—El Paso 2016, no pet.)); *see also Gallo v. State*, 239 S.W.3d 757, 762 (Tex. Crim. App. 2007) (recognizing these factors in considering whether the admission of photographs violates Rule 403).

### C. Analysis

26

Appellant argues that the record "does not give fair assurance that the erroneously admitted photographs did not influence the jury or that it influenced the jury only slightly in assessing appellant's conviction or punishment."

The photographs at issue showed Trejo's body, which had been dismembered with the head and limbs severed from the torso. Thus, the photographs depicted Trejo's death and tended to support Appellant's participation in the crimes. Moreover, they tended to corroborate Appellant's admission that she had sealed plastic bags containing the body parts. The photographs also showed restraints on Trejo's wrist and ankle, corroborating other evidence establishing he had been bound in the Alameda apartment prior to his death. For these reasons, the evidence was probative of Appellant's commission of the charged offenses and were useful to the State in proving its case and corroborating other evidence the State presented.

Lujan contends that the graphic nature of the photographs allowed the jury to render an improper decision on an emotional basis. Although the photographs were gruesome in that they showed Trejo's decomposing body with the head and limbs severed from the torso, the photographs depicted the nature and circumstances of the offenses Appellant and the other involved parties committed against Trejo. To that end, nothing in the record indicates the jury was unequipped to properly evaluate the probative force of the evidence. And although the State established through other evidence that Trejo had been bound and subsequently buried, the photographs were not merely cumulative because they tended to corroborate the State's evidence and presented a visual picture of what witness testimony could not depict. Moreover, the State did not take an inordinate amount of time to develop or present the evidence.

The photographs were printed in color and showed Trejo's naked body, potentially increasing the likelihood of inflaming the jury's emotions. However, the trial court only admitted two photographs, reducing the likelihood of unfair prejudice. Additionally, the photographs did not depict the body's mutilated state caused by the autopsy. Instead, as Appellant's interview statements suggested, the photographs depicted the body as it had been found after one or more of her collaborators had severed the head and limbs from the torso. Finally, the record indicates that the prosecutor only held the photographs up rather than use a projector to magnify the photographs while presenting them to the jury; nothing in the record indicates that they were oversized, shot from a close-up angle, or otherwise improperly emphasized.

In sum, although the photographs were graphic and likely more graphic than what an ordinary person is accustomed to seeing on a daily basis, applying the relevant factors to the facts shows that their admission was not substantially outweighed by the risk of unfair prejudice. We conclude that the trial court's decision to admit the photographs was not outside the zone of reasonable disagreement, and thus no abuse of discretion occurred. *See Chavez*, 2018 WL 2715219, at *9 (holding that the trial court properly admitted ten autopsy photographs over the defendant's Rule-403 objection where the photographs depicted the victim's injuries, showed the defendant's involvement in the victim's death, and helped to explain a medical examiner's testimony regarding her cause of death, notwithstanding the photographs' gruesome nature, the fact that they were in color, and the prosecutor's use of a projector to show the photographs to the jury).

Accordingly, we overrule Appellant's third issue.

## V. JURY ARGUMENT

In her fourth issue, Appellant argues the trial court abused its discretion by overruling her objection to the prosecutor's argument comparing Appellant to world leaders who commit murder and genocide. For the following reasons, we disagree.

### A. Standard of review and applicable law

We review a trial court's ruling on an objection to a jury argument under the same abuse-of-discretion standard set forth above. *See Brodenx v. State*, No. 08-13-00140-CR, 2014 WL 6873143, at *2 (Tex. App.—El Paso Dec. 3, 2014, no pet.) (not designated for publication) (citing *Davis v. State*, 329 S.W.3d 798, 825 (Tex. Crim. App. 2010)). Proper jury argument generally falls within one of four areas: (1) summations of the evidence; (2) reasonable deductions from the evidence; (3) answers to argument of opposing counsel; and (4) pleas for law enforcement. *Davis*, 329 S.W.3d at 821. We must examine the challenged jury argument in the context in which it appears. *Jackson v. State*, 17 S.W.3d 664, 675 (Tex. Crim. App. 2000).

### B. Analysis

During closing arguments in the punishment phase of trial, defense counsel argued that Appellant should receive a reduced sentence because she was not the person who "actually was doing the acts" or was the "mastermind" behind the offenses but rather that she was only a party to the offenses. The prosecutor made the following statement in his closing argument:

> So [defense counsel] talked about the defendant being a party and that her conduct was just that of a party. And because of that you, should show her mercy. You should be inclined to give her less [punishment] because she didn't get her hands dirty. Let's talk about history. We've had some horrible world history. I can think of several people that have not gotten their hands dirty that have been responsible for the murder of—

Defense counsel objected that the prosecutor's argument was inappropriate, and the prosecutor replied that he was responding to defense counsel's argument. The trial court overruled the

objection, and the prosecutor continued, "There have been many world leaders that have committed genocide." Defense counsel objected again because the prosecutor's argument inappropriately appealed to the jury's emotions, and the trial court again overruled the objection and replied that defense counsel "opened the door . . . [by] trying to say that she was less guilty because . . . of being a party" and that the prosecutor was "making an analogy." The prosecutor then moved on to other matters.

Considering the prosecutor's remarks in context, we conclude that the prosecutor made the argument at issue in response to defense counsel's request that the jury consider a lesser sentence because Appellant was not the person who directly committed the offenses. The prosecutor's argument that world leaders who enlist others to commit genocide are still morally culpable for their indirect participation in the killing of others was an appropriate analogy to Appellant's commission of the offense because although she may not have directly committed the kidnappings or murder, she nonetheless was a party to the offenses. *See Guerrero Lara v. State*, No. 13- 01- 099- CR, 2002 WL 1765543, at *4 (Tex. App.—Corpus Christi Aug. 1, 2002, no pet.) (not designated for publication) (where during the punishment phase, defense counsel's closing argument referred to a witness's testimony that the defendant was a good husband and father and the State responded with, "This man may have been capable of kindness on some days, but that's like saying Adolf Hitler provided for his family or Charles Manson sometimes smiled . . . ," the trial court did not err by overruling an objection to the prosecutor's argument because it was in response to defense counsel's argument).

The trial court acknowledged that defense counsel opened the door to the prosecutor's remarks, one of the areas of proper jury argument. *See Davis*, 329 S.W.3d at 821 ("an answer to

the argument of opposing counsel" is a general area of permissible jury argument). Because the trial court was not outside the zone of reasonable disagreement when it overruled Appellant's objection to the prosecutor's argument, the court did not abuse its discretion.

Accordingly, we overrule Appellant's fourth issue.

## VI. CONCLUSION

We affirm the judgment supporting Appellant's conviction.

LISA J. SOTO, Justice

May 17, 2023

Before Rodriguez, C.J., Palafox, and Soto, JJ.

(Do Not Publish)